796 A.2d 164

VINCENT AMORESANO, CHIEF OF POLICE, THE CITY OF PATERSON, AND PASSAIC COUNTY PROSECUTOR'S OFFICE, PLAINTIFFS, v. BERNARD LAUFGAS, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. BERNARD LAUFGAS, DEFENDANT–APPELLANT (TWO CASES).

Argued October 22, 2001—Decided January 29, 2002.

534

*Bernard Laufgas,* argued the cause *pro se.*

*Richard W. Berg,* Assistant Attorney General, argued the cause for respondent (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

## VERNIERO, J.

The issues raised in this appeal involve the judiciary's summary contempt power. We are called on to determine whether the trial court erred in imposing jail sentences of varying lengths on the same litigant after finding him in contempt on three separate occasions. In accordance with *Rule* 1:10–1, the trial court founded the first adjudication on a series of letters and certifications in which the litigant made highly disparaging comments about the judge. Pursuant to *Rule* 1:10–2, a different judge based the second adjudication on the court's findings that the litigant had violated numerous provisions of a temporary restraining order. Finally, under that same rule, a third judge held the litigant in contempt based on the court's finding that he had attempted to intimidate a witness and opposing counsel.

A divided panel of the Appellate Division affirmed the three adjudications. We affirm the disposition in the first and third actions, and reverse the disposition in the second action.

## I.

Given the long, circuitous path on which this case has traveled, a brief road map is in order. The City of Paterson (the City) and its Chief of Police, Vincent Amoresano (collectively, plaintiffs), filed a Chancery Division action in June 1996 against Bernard Laufgas (defendant). Somewhat ironically, that action, which also centered on alleged disruptive conduct on the part of defendant, provided the medium in which defendant engaged in the separate acts of contempt that are the subject of this appeal.

Plaintiffs' action sought both temporary and permanent restraints. Over the lengthy history of their dispute, the parties appeared before several judges. Judge Saunders considered plaintiffs' request for temporary restraints, entering those restraints in July 1996. Two years later, Judge Passero presided over an eight-day trial, and ruled in favor of plaintiffs in respect of their application for permanent restraints. In the interim, Judge Passero addressed numerous pre-trial issues. Although named as a plaintiff, the Passaic County Prosecutor's Office essentially ended its participation in April 1997 for reasons not relevant to our disposition.

Judge Passero adjudicated the first of the three contempt charges that grew out of plaintiffs' underlying Chancery Division action. Two other trial judges respectively adjudicated the second and third contempt charges. We will first describe the facts pertaining to plaintiffs' action, derived largely from the trial testimony presented before Judge Passero. We then will outline defendant's conduct that formed the basis of the three contempt adjudications.

## A.

At all times relevant to this dispute, defendant was a resident of Barnegat. In February 1996, defendant traveled to the City to

photograph furniture and garbage left by former tenants of a dwelling owned by his wife. In response to a telephone call from the owner of a neighboring house, a City police officer arrived at the scene to investigate whether the debris was being left in front of that neighbor's property. The officer testified that when he approached defendant to discuss the neighbor's call, defendant became "arrogant" and "nasty."

After defendant twice refused to identify himself, the officer charged him with obstructing a governmental function in violation of *N.J.S.A.* 2C:29-1. The officer also issued defendant a ticket for obstructing the sidewalk with the debris. After the issuance of that summons, defendant's contact with City officials intensified and grew increasingly adversarial. Defendant filed a complaint with the Police Department's Office of Internal Affairs, alleging that the officer who had issued him the ticket had made racial slurs toward defendant. A different officer investigated that complaint and concluded that there was no basis for it, a finding accepted by Chief Amoresano.

A third officer testified that on several occasions defendant disrupted the employees working at the police chief's office. As an example, the officer explained that defendant would demand to see Chief Amoresano without an appointment. When those requests were refused, "[defendant] would become hostile, he would become abusive; he'd raise his voice [so] that it would be totally disturbing[.]" On one occasion, the officer escorted defendant out of police headquarters after he purportedly became abusive and refused to comply with repeated requests to leave. Defendant subsequently filed a criminal complaint against that officer, charging him with official misconduct. That complaint was later dismissed.

A parking violations officer testified that she had encountered defendant when she was issuing summonses to vehicles parked at the City's public safety complex. According to the officer, she observed defendant in a small gray car that was parked illegally. When she informed him that he needed a parking permit, defen-

dant yelled at the officer. Defendant ordered the officer to issue summonses to the police cars found in the same area, cars that defendant contended also had been parked illegally.

The officer issued only a warning to defendant. Nonetheless, he purportedly followed her and yelled at her for approximately forty minutes as she tried to continue her duties. The officer further testified that she had felt threatened by defendant's behavior, and that his conduct had interfered with her work. Defendant later filed criminal charges against the parking violations officer, alleging official misconduct because she had refused to issue tickets to the marked patrol cars.

A police captain testified that he had observed defendant in the municipal parking lot in the section reserved for court employees and municipal court judges. The officer stated that defendant was recording license plate numbers and photographing vehicles. The officer later learned that defendant had obtained the home addresses of police officers through records obtained from the New Jersey Division of Motor Vehicles. After photographing the cars of City officials, defendant issued "citizen parking violations" for vehicles owned by City employees.

The City's clerk testified that defendant had sent a letter to the Mayor requesting that he (defendant) be permitted to inspect a large number of documents. The clerk estimated that those documents, some of which dated as far back as sixteen years, would have amounted to about 500,000 pages. She also testified that when defendant visited the clerk's office "he demand[ed] information ... and he often [became] abusive and disruptive[.] ... [M]y staff tr[ied] to assist him[,] and when they [could not] assist him [ ] they [would] call me out because they [were] afraid[,] and they [felt] that [he was] disrupting the office." In the same vein, the clerk noted that "because of the nature of his comments and language that he use[d]," her staff was fearful of defendant. Defendant filed criminal charges against the clerk for official misconduct, but those charges eventually were dismissed.

Another City employee, a license inspector, testified that defendant came to his office and disrupted the employees working there by announcing that he was suing the City. Defendant allegedly asserted that he had a right to publish the home addresses of public employees. The inspector also testified that defendant "made a comment about Miss Susan Champion, the City Attorney. He stated that ... Susie thought she was cute, but she screwed herself. He did not elaborate on that."

Another police officer, a lieutenant who had been assigned to the records bureau in 1996, testified that defendant had requested numerous police reports. When asked to pay the copying charge for those documents, defendant allegedly became abusive and refused to pay. The lieutenant also testified that defendant went to the records bureau "for all different kind[s] of reports not relating to anything," and did not offer his staff the specific information necessary to locate the requested documents. According to the officer, when members of the bureau staff tried to clarify defendant's request, "he became abusive, nasty, [and] called them stupid, ignorant, [saying] that's the only job they could get working for the City." The officer noted that if he had produced all of the police reports requested by defendant, they would have amounted to over a million pages. He described defendant as using loud and abusive language after his requests had been denied and stated that such conduct intimidated other citizens looking for records.

A sixth police officer, a sergeant, had contact with defendant. The sergeant testified that he had been called to the public works department because "there was an individual fighting inside the office." According to the officer, when he arrived on the scene, he heard defendant insult at least three female employees by "calling them incompetent[ ] idiots." Defendant purportedly spoke loudly and belligerently, and was aggravating those around him. The officer testified that it took him at least five minutes to persuade defendant to leave the office and that defendant was "nasty" and "insulting" to the women working there. The sergeant also

expressed the view that employees at the public works department were unable to function when defendant was in their office. Consistent with past practice, defendant filed criminal charges against the sergeant, alleging official misconduct. Those charges were later dismissed.

Plaintiffs filed a complaint and applied for an order to show cause in the Chancery Division in June 1996. Specifically, plaintiffs sought to restrain defendant from mailing discovery requests or communications "of any nature" to City employees at their home addresses; from obtaining or publicizing the home addresses of City employees; from going to the homes of City employees; from entering public buildings unless defendant had a purpose that could not be satisfied by telephone or mail; and from engaging in "loud, abusive, or disruptive conduct" in public buildings. They sought also to require that defendant mail all pleadings and discovery requests directly to the City's attorneys rather than serve or deliver such documents personally.

On the return date of the order to show cause, Judge Saunders considered numerous affidavits of City employees describing defendant's conduct as well as the arguments presented by the parties. Defendant represented himself *pro se*, a practice that he has maintained throughout the course of this litigation. The trial court entered the temporary restraints in an order dated July 17, 1996, the relevant portions of which are as follows:

1. The [d]efendant ... is hereby restrained from contacting or communicating in any fashion, including but not limited to mail, with employees of the City of Paterson, including but not limited to Paterson police officers, at their home address[es].

2. The [d]efendant ... is restrained from going to the homes of any employees of the City of Paterson including but not limited to Paterson police officers.

3. The [d]efendant ... is restrained from obtaining or publicizing the home addresses of City of Paterson police officers or any party to this litigation, including specifically restrained from obtaining said information from the New Jersey Division of Motor Vehicles.

4. The [d]efendant ... is restrained from personally serving papers of any kind, including, but not limited to summonses, complaints, and discovery requests on any employee of the City of Paterson. The Corporation Counsel's office of the City of Paterson shall accept all mailings from the [d]efendant ... and acknowledge

service of same. In the event that service of said pleadings cannot be made by mail, the Corporation Counsel's office of the City of Paterson will acknowledge personal service of said papers on the part of the City or any employee thereof. Said service on the Corporation Counsel's office shall constitute good service on any employee of the City of Paterson.

5. The [d]efendant['s] ... access to City of Paterson public buildings is limited to those in which he has legitimate business. Defendant['s] ... access to said buildings is specifically conditioned on his advising the office of Corporation Counsel of the City of Paterson by telephone in advance at least 2 hours of his entering any City building and the purpose for his entry into said building.

6. The [d]efendant ... is restrained from abusive or disruptive conduct while in public buildings of the City of Paterson.

. . . .

11. These preliminary restraints will continue until the final trial of this matter.

Defendant filed a motion asking the court to reconsider those temporary restraints. The court denied that motion. Defendant also filed a complaint entitled "Cross Complaint in Lieu of Prerogative Writ." That complaint sought disclosure of certain records and documents described above, *see supra* at 539, and attempted to revive defendant's previous bias complaints against the police department. The complaint named the Mayor as one of the defendants, in addition to other officials. The complaint was later dismissed.

Defendant also filed a criminal complaint against Judge Saunders and his law clerk. Like others filed by defendant, that complaint was later dismissed. Nevertheless, Judge Saunders recused himself from the litigation in August 1996. The case was then assigned to Judge Passero. The court thereafter restrained defendant from filing further criminal complaints against any person involved in the proceedings without first obtaining a probable cause finding from a neutral judicial officer. Although the time for discovery had passed in plaintiffs' Chancery Division action, the court permitted defendant additional time to serve interrogatories.

In June 1997, defendant filed a motion seeking to disqualify Judge Passero. He also sought disqualification of the City's attorney, Susan Champion. Judge Passero denied those motions,

stating that he regarded them as "totally frivolous[.]" The court further stated that

[defendant] somehow has to learn that because a judge makes a ruling he does not like, that does not give him the right to file criminal charges against the judge, to threaten charges against the judge, to file ethics charges against the judge and the like. We have an appellate process. Lawyers are bound by that. Litigant[s] have to be bound by that.

There is a criminal law provision that deals with attempts at intimidation where cases are pending. And it seems to me that that provision may very well apply to the type of conduct that has been going on in this case before Judge Saunders [and] before me[.] All while they're pending, these threats are being made.

Judge Passero also continued to address the issue of interrogatories. The court limited defendant to fifty single-part questions to the City and fifty single-part questions to Chief Amoresano. Because defendant apparently did not comply with that order, the court denied defendant's subsequent motion to compel interrogatory answers. The court, however, gave defendant thirty days to serve new interrogatories that complied with its original order.

On December 10, 1997, defendant sent Judge Passero a letter stating in part:

I am sorry to say I believe Susan Champion is the type of lawyer, that will sell her mother and father for two bits. While she gets great paid [sic] for her representing [the City], all I am attempting to [do is] defend my rights thought [sic] all those lies she is submitting to the court.... Judge Passero, I believe, this case is run[ ] from the 2nd floor of the City of Paterson, not from the Passaic County Courthouse.

Defendant served his second set of interrogatories in December 1997. Plaintiffs responded about a month later. Defendant stated in a February 2, 1998, letter to Champion: "You are not my attorney ... you[r] sole function in this matter is to be a good little girl and respond. You may have your way with Judge Passero[.] I don't know what you do[ ] with him to get your way, but in this matter you will respond." On its face, the letter does not indicate that it had been copied to Judge Passero. The court, however, received a copy of it on February 5, 1998, presumably as part of the record of the litigation.

On February 9, 1998, defendant asserted in another letter to Champion that he considered the City's responses to his interrog-

atories to be "evasive or unanswered," and that "[w]hile Judge Passero and yourself entered into a conspiracy to limit me to 100 question[s] and no oral deposition ... [y]ou file[d] this civil action on behalf of [the City] for the sole reason to harass me[.]" Defendant sent a copy of that letter to Judge Passero in addition to other members of the judiciary. Defendant thereafter filed another motion to dismiss plaintiffs' action.

The parties appeared before Judge Passero in March 1998. At that time, the trial court noted that the case was scheduled for trial in April. The court suggested that defendant obtain the services of counsel. (The court had urged defendant to retain an attorney on more than one occasion.) Defendant rejected that suggestion. The court also determined that plaintiffs "fairly, fully, and adequately" answered defendant's interrogatories and thus denied defendant's motion to compel additional discovery. Lastly, defendant was directed to refrain from personally serving papers on the judge or any members of his staff.

In April 1998, prior to the start of the trial, defendant served Champion with a subpoena to appear as a witness and again filed a motion to disqualify Judge Passero. In an April 15, 1998, letter to the judge, defendant wrote:

I know you hate me, I don't know why[ ], but would love to find out. I guess doing favors for politicians, selling out justice, makes you feel good, I am sorry for you.

Dear Judge, you are history, you will no longer be seating [sic] or hearing any of my cases, [i]n fact you are my witness. By the time you get this letter, you will be the proud owner of one of my subpoenaed [sic] as a witness in this matter. It's great to have you on my side, the winning side for a change. Just as I have said all along, you are trying your best to fix the case.

In addition to that letter, defendant filed numerous certifications in support of his motion to disqualify the judge. In a certification filed on April 20, 1998, defendant stated that "Judge Passero clearly is motivated by his close relation with the Political parties not the judicial system." In that same certification he stated: "I understand why Susan Champion and Plaintiff never asked for discovery and or Interrogatories, since Judge Passero is conspiring to fix this case." That language was consistent with a

prior June 22, 1997, certification in which defendant stated that Judge Passero "leans of being a bias[ed], corrupt and irresponsible judge controlled and manipulated by political influence[s] in the City of Paterson." In yet another certification, filed April 13, 1998, defendant stated that "Judge Passero discussed with other judges and insured that other judges fix cases against defendant."

Shortly after sending the April 15, 1998, letter, defendant appeared in open court and presented Judge Passero with a subpoena to appear at the upcoming trial. Defendant stated, "By the way now you're a witness so you can't be the judge in the case. In the meantime have a nice day." When the judge informed defendant to be present in court on the following Monday for the start of the trial, defendant again requested that the judge recuse himself. The judge later denied defendant's renewed request.

The trial commenced on April 20, 1998, and ended on April 29, 1998. Numerous witnesses appeared on behalf of plaintiffs. The witnesses described the course of events beginning in February 1996 when that first City police officer issued defendant the ticket for allegedly obstructing a sidewalk with debris. The succeeding events that mushroomed from that initial incident, as well as a summary of the witnesses' testimony, are set forth above. *See supra* at 537–41.

At the conclusion of the bench trial, Judge Passero ruled in favor of plaintiffs, concluding that "[defendant] finds symbols of authority to be offensive and tries his best to degrade symbols of authority by threats, by charges, by innuendoes, [and] by intimidation[.]" The trial court also noted that defendant previously had been convicted of physically assaulting a municipal court judge in a another municipality, suggesting that the City's police officers had acted with appropriate caution in their interactions with defendant. The court entered the final restraining order on May 5, 1998.

### B.

Against that extensive backdrop, we now focus on the specific findings of contempt that are the subject of this appeal. On the

first day of the trial of plaintiffs' Chancery Division action, Judge Passero charged defendant with contempt in the face of the court in accordance with *Rule* 1:10–1. We describe that rule in detail below. Generally, it authorizes a court to adjudicate contempt summarily, without issuing an order to show cause, under certain conditions.

The trial court summarized the numerous letters and certifications sent or filed by defendant· that constituted the factual basis for the contempt charge. The court relied on a total of twelve documents. Those documents included defendant's December 10, 1997, and April 15, 1998, letters to the judge; the two February 1998 letters to Champion; and defendant's numerous certifications in support of the disqualification motions. The court deferred adjudication of the charge and imposition of punishment until the trial for plaintiffs' restraints ended.

We note that during the pendency of that trial, on April 27, 1998, the court pointedly asked defendant whether he wanted to address the contempt charge before the trial concluded. Judge Passero stated, "I've charged you with contempt in the face of the [c]ourt under 1:10–1 and I'll deal with that at the end of the case, unless you prefer that I deal with it now. Do you want to deal with it now?" The court then explained the process of appellate review and again stated, "if you want to deal with the contempt this afternoon, we'll deal with it this afternoon." Defendant replied, "No. I'll wait until the end."

After hearing summations in plaintiffs' action, Judge Passero reiterated the basis for contempt and provided defendant with the opportunity to respond. Defendant denied that he intended any disrespect toward the court. The court summarized defendant's position by observing, "Your logic is this: You can say anything you want about a judge, you can accuse the judge of unethical conduct . . . all without any foundational basis, and as long as you sign the letter 'respectfully submitted' you deem it okay." The trial court issued its certification and order of contempt on April 29, 1998. It sentenced defendant to sixty days in the county jail.

The second adjudication of contempt arose from an application by the City's attorney in which she claimed that defendant had violated numerous paragraphs of Judge Saunders' July 17, 1996, temporary restraining order (TRO). In support of that application, Champion presented numerous witnesses who testified before Judge Passero on April 20 and April 21, 1998. Those witnesses testified that defendant was loud and verbally abusive when he dropped off documents at the City's law department; that defendant entered the Mayor's office requesting the name of a certain receptionist; that defendant parked his vehicle at a curb on a residential street, next to the home of Lieutenant Lawrence Gallagher, a City police officer, while a process server delivered a subpoena directed to the officer's wife; and that the same process server delivered a similar subpoena to the wife of another police officer at that officer's home while defendant watched from a parked vehicle across the street.

Defendant testified on his own behalf, denying that he had violated any provision of the TRO. Following that testimony, Judge Passero issued an order to show cause pursuant to *Rule* 1:10–2. Generally stated, that rule provides that institution of summary contempt proceedings, other than proceedings under *Rule* 1:10–1, shall be on notice to the alleged contemnor and instituted only "by the court upon an order for arrest or an order to show cause specifying the acts or omissions alleged to have been contumacious." *R.* 1:10–2(a).

On June 22, 1998, a different judge presided over the proceeding instituted by Judge Passero. Judge Marmo found that defendant had violated various paragraphs of the TRO, and sentenced him to thirty days in the county jail. In reaching that conclusion, the court relied on the testimony of the State's witnesses contained in the transcripts of the proceeding held before Judge Passero. The court also considered the testimony of two witnesses offered by defendant. The State did not call any witnesses before Judge Marmo, relying entirely on the testimony contained in the transcripts.

The third and final finding of contempt arose from an application made by Champion, also under *Rule* 1:10–2. The basis of that application was that defendant allegedly made intimidating comments to Lieutenant Gallagher's wife, and made similar comments to Champion. A Sheriff's officer and State Police detective each heard and described what he considered to be defendant's intimidating comments. According to the Sheriff's officer, defendant allegedly stated in a loud voice to the officer that "he was going to sue the wives next, the wives of the police officers and that he was going to call the children [of the officers] to testify." He made those comments in the courtroom in the presence of Lieutenant Gallagher's wife. Mrs. Gallager, who had been subpoenaed by defendant, was seated next to her husband at the time of defendant's statements.

The State Police detective testified that he had heard defendant state to Champion "that [she] would be the target of his next civil case." The detective testified further that, in his view, the clear purpose of defendant's comments was "to intimidate [Champion], perhaps to either back off from what [she was] doing in this case or in any other future cases." Based on the testimony of the Sheriff's officer and the State Police detective, Judge Passero issued his second order to show cause under *Rule* 1:10–2.

A third judge, Judge Donato, conducted the proceeding in respect of the second *Rule* 1:10–2 contempt application. Unlike the prior *Rule* 1:10–2 proceeding, the State called numerous witnesses, including the Sheriff's officer and State Police detective, who testified before Judge Donato in support of the application. Following that testimony, the court found defendant guilty of contempt for attempting to intimidate Lieutenant Gallagher's wife and Champion. On July 20, 1998, the court sentenced defendant to sixty days in the county jail.

To summarize, there are three contempt adjudications before us for review: (1) the *Rule* 1:10–1 adjudication, based on the letters and certifications that were sent to or filed with Judge Passero during the course of plaintiffs' litigation, for which defendant was

sentenced to sixty days in the county jail; (2) the first *Rule* 1:10–2 adjudication, based on violations of the TRO, for which defendant was sentenced to thirty days in the county jail; and (3) the second *Rule* 1:10–2 adjudication, based on the findings that defendant had attempted to intimidate a witness and the City's attorney, for which he was sentenced to sixty days in the county jail.

With one member of the panel dissenting, the Appellate Division affirmed all three dispositions. Defendant appeals to this Court as of right. *R.* 2:2–1(a)(2). We now affirm the Appellate Division in respect of the *Rule* 1:10–1 action and the second *Rule* 1:10–2 action. We reverse the order of contempt in respect of the first *Rule* 1:10–2 action. For completeness, we note that the Appellate Division also concluded that certain provisions of the final restraining order are overly broad, and directed that the order be modified. That aspect of the panel's disposition is not before us for review.

## II.

 We begin our analysis by noting these general principles.

The law of contempt is derived from statutes, rules of court, and judicial decisions. In general, contempt includes disobedience of a court order or misbehavior in the presence of the court by any person or misbehavior by an officer of the court in his official transactions. The essence of the offense is defiance of public authority.

A defendant is entitled to certain safeguards accorded criminal defendants. Those safeguards include the presumption of innocence, the privilege against self-incrimination, the right of cross-examination, proof of guilt beyond a reasonable doubt, and the admissibility of evidence in accordance with the rules of evidence. However, there is no constitutional right to indictment or trial by jury in every summary criminal contempt proceeding.

[*In re Yengo,* 84 *N.J.* 111, 119–20, 417 *A.*2d 533 (1980) (internal citations omitted).]

The power of our courts to punish for contempt is long established. *In re Buehrer,* 50 *N.J.* 501, 513, 236 *A.*2d 592 (1967). We have described it as an extraordinary power, to be exercised sparingly against those whose conduct "has the capacity to undermine the court's authority and to interfere with or obstruct the

orderly administration of justice[.]" *In re Daniels*, 118 *N.J.* 51, 61, 570 *A.*2d 416 (1990). As Justice Handler succinctly stated, "there are occasions when this inherent authority must be exercised both swiftly and summarily in order to ensure obedience to court orders and respect for court procedures." *In re Yengo, supra*, 84 *N.J.* at 130, 417 *A.*2d 533 (Handler, J., concurring).

Generally, the Rules of Court provide for two methods of trying the alleged contemnor, "depending upon whether the offense was committed in, or outside, the presence of the court." *In re Carton*, 48 *N.J.* 9, 21, 222 *A.*2d 92 (1966). Acts committed in the presence or face of the court are governed by *Rule* 1:10–1. That rule provides in full:

A judge conducting a judicial proceeding may adjudicate contempt summarily without an order to show cause if:

(a) the conduct has obstructed, or if continued would obstruct, the proceeding;

(b) the conduct occurred in the actual presence of the judge, and was actually seen or heard by the judge;

(c) the character of the conduct or its continuation after an appropriate warning unmistakably demonstrates its willfulness;

(d) immediate adjudication is necessary to permit the proceeding to continue in an orderly and proper manner; and

(e) the judge has afforded the alleged contemnor an immediate opportunity to respond.

The order of contempt shall recite the facts and contain a certification by the judge that he or she saw or heard the conduct constituting the contempt and that the contemnor was willfully contumacious. Punishment may be determined forthwith or deferred. Execution of sentence shall be stayed for five days following imposition and, if an appeal is taken, during the pendency of the appeal, provided, however, that the judge may require bail if reasonably necessary to assure the contemnor's appearance.

[*R.* 1:10–1.]

Applying those tenets and the five enumerated requirements of the rule, we are satisfied that the trial court did not err in adjudicating defendant in contempt under *Rule* 1:10–1. In respect of the first requirement, we agree with the finding expressed in Judge Passero's certification that defendant "attempted to obstruct the court proceedings by undermining [the] court's position and authority[.]" Defendant's repeated attempts to disqualify the trial judge without foundation, coupled with his base-

less efforts to subpoena the judge to cause his recusal, had obstructed the pre-trial proceedings and, if left unchecked, would have obstructed the trial itself.

Defendant revealed his purpose in his April 15, 1998, letter to the judge, in which he wrote "you are history, you will no longer be seating [sic] or hearing any of my cases, [i]n fact you are my witness. By the time you get this letter, you will be the proud owner of one of my subpoenaed [sic] as a witness in this matter." He essentially repeated those words directly to the judge in open court. Given defendant's extensive pattern of prior conduct, we are persuaded that the trial court was justified in its view that defendant's continued behavior would have obstructed the trial if the court had not acted when it did. The requirement of *Rule* 1:10–1(a) has been satisfied.

■ In respect of the second requirement, we must evaluate whether defendant's conduct "occurred in the actual presence of the judge, and was actually seen or heard by the judge[.]" *R.* 1:10–1(b). This Court has noted previously that "direct contempt, or contempt in the face of the court, is conduct that a judge can determine through his own senses is offensive and that tends to obstruct the administration of justice." *In re Yengo, supra*, 84 *N.J.* at 123, 417 *A.*2d 533. Here, defendant's conduct consisted primarily of the filing of numerous letters and certifications containing highly disparaging comments about the judge. That raises the question whether a contemnor's letters and certifications, filed in connection with repeated motions, may qualify as contempt in the "actual presence" of the court.

In addressing that question, a brief discussion of the background to *Rule* 1:10–1 may be helpful. This Court adopted the current text of the rule as proposed by the Civil Practice Committee in its 1994 report on the subject. See *1994 Report of the Supreme Court Committee on Civil Practice* (Jan. 18, 1994), including *Report of the Subcommittee on Summary Contempt* (*Subcommittee Report* ). That report concluded that "the court's power to respond on the spot to contumacious conduct should be

limited to that conduct and those situations which by their nature must be immediately dealt with rather than deferred for later adjudication." *Subcommittee Report* at 2–3. The Committee recommended that to effectuate that limitation, *Rule* 1:10–1 should "make[ ] clear that the conduct must occur during the actual course of judicial proceedings, *i.e.*, in the courtroom or in chambers." *Id.* at 3.

That recommendation, and its ultimate embodiment in the rule, would seem to run counter to a series of older decisions in which acts committed outside of the courtroom were found to be contumacious in the face of the court. *See, e.g., In re Jenkinson*, 93 *N.J.Eq.* 545, 118 *A.* 240 (Ch.1922) (act of contempt consisted of sending threatening letter to clerk of court); *In re Bowers*, 89 *N.J.Eq.* 307, 104 *A.* 196 (Ch.1918) (act of contempt took form of threatening letter from father of husband in divorce proceeding to wife's attorney); *State v. Sax*, 139 *N.J.Super.* 157, 353 *A.*2d 113 (App. Div.) (contumacious act consisted of ticketed motorist sending municipal clerk angry letter, in which motorist directed obscenities to clerk), *certif. denied*, 70 *N.J.* 525, 361 *A.*2d 540 (1976).

We agree that the 1994 revisions were intended to limit the summary contempt power under *Rule* 1:10–1 to the defined instances noted in the rule. Thus, a vituperative letter from one litigant to another, an angry motorist's letter containing obscenities addressed to a court clerk, or an isolated letter containing disrespectful statements to a judge, and similar material, ordinarily would not qualify as contempt in the presence of the court. That, however, is not this case.

Here, defendant authored and submitted twelve separate letters or certifications containing derogatory and scornful comments about the judge who was presiding over litigation in which defendant was a party. The court received those materials in chambers during the pendency of an active case at different intervals in the litigation. In many instances, defendant's statements were related directly to motions to disqualify the judge, motions intended to be heard in open court. In this narrow circumstance, we are

persuaded that *Rule* 1:10–1 includes within its ambit the form of conduct at issue here. Thus, the requirement of *Rule* 1:10–1(b) has been satisfied.

■ We next must determine whether "the character of [defendant's] conduct or its continuation after an appropriate warning unmistakably demonstrat[ed] its willfulness[.]" *R.* 1:10–1(c). That defendant's conduct was willful appears almost self-evident from the conduct itself. Defendant has never denied writing the letters or certifications at issue, nor has he attempted to withdraw any of the more objectionable material. Instead, his conduct seemed calculated to force the withdrawal of Judge Passero from the litigation, presumably because defendant did not agree with one or more of the court's rulings.

Even if we were to assume that defendant's conduct by its character did not demonstrate its willfulness, the record reveals that the trial court had warned defendant that he must stop filing unfounded and threatening certifications. The court stated as early as July 1997 that defendant

somehow has to learn that because a judge makes a ruling he does not like, that does not give him the right to file criminal charges against the judge, to threaten charges against the judge, to file ethics charges against the judge and the like. We have an appellate process. Lawyers are bound by that. Litigant[s] have to be bound by that.

Reviewing defendant's conduct and the record as a whole, we conclude that the mandate of *Rule* 1:10–1(c) has been met.

■ The rule further provides that a summary contempt order may be entered only if "immediate adjudication is necessary to permit the proceeding to continue in an orderly and proper manner[.]" *R.* 1:10–1(d). As noted, the court initially stated its reasons for charging defendant with contempt at the outset of the trial. We agree with the trial court that its action "was necessary to permit the trial of this matter to proceed in an orderly and proper manner, to preserve the integrity and dignity of this court." In view of the extensive record of defendant's prior conduct in the months leading up to the trial, the court's decision to act was reasonable and, therefore, sustainable. *Cf. State v.*

*Zhu,* 165 *N.J.* 544, 555, 761 *A.*2d 523 (2000) (observing that "we [should] not substitute our judgment for the judgment of those closest to the trial when it appears that they have acted reasonably under the circumstances").

■ Lastly, the rule requires that before a summary adjudication occurs the court must accord "the alleged contemnor an immediate opportunity to respond." *R.* 1:10–1(e). The court made its intentions known on the first day of trial and stated that it was deferring further action until after the trial's conclusion. At a subsequent juncture in the trial, the court asked defendant whether he wanted to address the issue before the trial ended. Defendant preferred to wait. After hearing closing statements in plaintiffs' trial, the court reiterated the basis for contempt. Then, the court accorded defendant an opportunity to contest that basis and present any defenses or explanations that might have served to rebut the charge or lessen the punishment.

We are satisfied that the trial court accorded defendant a realistic opportunity to respond immediately after it restated the charges at the conclusion of plaintiffs' trial, and before it pronounced judgment. As this Court noted in a similar setting, "the fact that the judge used the words 'I find you in contempt' before giving defendant the opportunity to speak did not abridge his right to be heard.... [T]he words themselves should not control where the one charged with contempt is actually permitted to respond, as [the defendant] was here." *In re Daniels, supra,* 118 *N.J.* at 69, 570 *A.*2d 416 (internal citations omitted). Under those circumstances, we find that the court's action under *Rule* 1:10–1(d) and (e) is sustainable.

■ We hold, therefore, that the trial court did not err in the adjudication of contempt under *Rule* 1:10–1. We reiterate that the judiciary's summary contempt power "should be exercised sparingly and only in the rarest of circumstances." *In re Daniels, supra,* 118 *N.J.* at 61, 570 *A.*2d 416. This is such a rare case. We acknowledge that the trial court permitted a temporal gap between the contempt charge and formal adjudication of that charge.

We would expect a trial court, in a more typical *Rule* 1:10–1 proceeding, to charge the alleged contemnor, provide him or her with an immediate opportunity to respond, and then adjudicate the matter without interruption.

■ In this case, however, the gap did not disadvantage defendant, a *pro se* litigant, because it gave him the opportunity to retain an attorney prior to the formal adjudication. In that regard, when notifying defendant of the contempt citation on the first day of plaintiffs' trial, the court pointedly stated: "I will give you an opportunity to explain, to show extenuating reasons[,] *to have an attorney, which I urge that you have*[,] and I will give you a full opportunity[,] but I'm citing you for contempt." (Emphasis added.) Also, as previously noted, defendant apparently preferred to wait until the conclusion of plaintiffs' trial before finalizing the contempt disposition.

We also are satisfied the trial court's process was necessary given the unique history of the case. When plaintiffs' trial commenced, the court was faced with defendant's highly disparaging letters and certifications, and the likelihood that defendant would continue to act improperly. As noted in the State's brief, the timing of the initial contempt charge was "necessary to ensure continuity of the proceedings ... because defendant was engaging in a continuous pattern of misconduct[.]" Because a primary purpose underlying the contempt power is to vindicate a court's authority, see *In re Adler*, 153 *N.J.Super.* 496, 501, 380 *A.2d* 298 (App.Div.1977), the trial court took appropriate action at the outset to deter defendant from further acts that would have obstructed the trial.

■ Lastly, we find nothing in the record to suggest that Judge Passero overreacted to defendant's accusations or that the court harbored any bias toward defendant. We cannot assume or conclude, simply because the trial court was the subject of disparaging comments, that bias infected either the adjudication of contempt or the sentence imposed. In addition, we note the observation of the United States Supreme Court that "where acts

of contempt are palpably aggravated by a personal attack upon the judge, in order to drive the judge out of the case for ulterior reasons, the scheme should not be permitted to succeed." *Cooke v. United States*, 267 *U.S.* 517, 539, 45 *S.Ct.* 390, 396, 69 *L.Ed.* 767, 775 (1925).

In sum, in view of the whole record, the Court is convinced that defendant committed the acts of contempt as charged, and that he was provided a fair opportunity to respond before the trial court rendered its final order. We also are satisfied that the adjudication and process employed by the trial court was necessary and "just under the circumstances." *R.* 2:10–4. In the last analysis, we decline to second-guess the court's determination in this unique setting. The *Rule* 1:10–1 proceeding passes muster.

## III.

We next turn to the two *Rule* 1:10–2 adjudications. *Rule* 1:10–2 provides in full:

(a) Institution of Proceedings. Every summary proceeding to punish for contempt other than proceedings under *R.* 1:10–1 shall be on notice and instituted only by the court upon an order for arrest or an order to show cause specifying the acts or omissions alleged to have been contumacious. The proceedings shall be captioned "In the Matter of _____ Charged with Contempt of Court."

(b) Release Pending Hearings. A person charged with contempt under *R.* 1:10–2 shall be released on his or her own recognizance pending the hearing unless the judge determines that bail is reasonably necessary to assure appearance. The amount and sufficiency of bail shall be reviewable by a single judge of the Appellate Division.

(c) Prosecution and Trial. A proceeding under *R.* 1:10–2 may be prosecuted on behalf of the court only by the Attorney General, the County Prosecutor of the county, or where the court for good cause designates an attorney, then by the attorney so designated. The matter shall not be heard by the judge who instituted the prosecution if the appearance of objectivity requires trial by another judge. Unless there is a right to a trial by jury, the court in its discretion may try the matter without a jury. If there is an adjudication of contempt, the provisions of *R.* 1:10–1 as to stay of execution of sentence shall apply.

*Rule* 1:10–2 contemplates that when the matter is heard by a judge other than the one who instituted the proceeding, the alleged contemnor will be permitted to cross-examine the State's witnesses and otherwise put on a defense before the judge who

actually adjudicates the matter. That did not occur in the first *Rule* 1:10–2 proceeding. There, the State did not call any witnesses before Judge Marmo. The State relied exclusively on the testimony of the prior witnesses contained in the transcript of the proceedings conducted before Judge Passero.

On the first day of plaintiffs' trial for restraints, the City's attorney made the application underlying the first *Rule* 1:10–2 charge when she claimed that defendant had violated numerous provisions of the TRO. Defendant seemed surprised and asked the court, "Judge, are we going to have testimony on this today?" The court replied, "Right now." Champion then presented numerous witnesses in support of her application. Although defendant had the opportunity to cross-examine those witnesses, he received inadequate notice for purposes of preparing an effective cross-examination.

That process might have been sufficient to sustain the court's order to show cause. However, when the matter was transferred to the subsequent judge for adjudication, defendant should have been given the opportunity to confront and cross-examine the State's witnesses before that judge. In the absence of that critical safeguard, the court was unable to evaluate fully the demeanor and credibility of the witnesses. *Abeles v. Adams Eng'g Co.*, 35 *N.J.* 411, 427, 173 *A.*2d 246 (1961) (emphasizing importance of "conscientious conclusion of the trier of the facts as to which witnesses were more worthy of belief").

 In reaching that conclusion, we are mindful that, by its nature, the summary contempt proceeding accords the alleged contemnor less than a full panoply of procedural safeguards. *See In re Daniels, supra*, 118 *N.J.* at 60, 570 *A.*2d 416 (noting that punishment under court's contempt power "is imposed without the familiar procedures that ordinarily attend the criminal law"). That being the case, courts must maintain with care the protections articulated in *In re Yengo* and similar cases. Because one critical protection, the right to confrontation and cross-examination, was abridged in the first *Rule* 1:10–2 proceeding, we hold

that the adjudication of contempt resulting from that proceeding cannot be sustained.

There was no similar procedural flaw in the second *Rule* 1:10–2 proceeding. In that action, the State presented its witnesses before the court that actually adjudicated the contempt. Defendant had notice of the hearing, was permitted to cross-examine all witnesses, and had adequate time to prepare a proper defense.

The remaining issue in respect of the second *Rule* 1:10–2 action is whether defendant's conduct itself was contumacious. In instituting the proceeding, Judge Passero stated, "I'm satisfied that probable cause exists. That [defendant] by words stated to [ ] Champion and ... in front of Lieutenant Gallagher[ ] and his wife, attempted to intimidate these two people, one being a witness about to testify[.] ... It's an intimidation tactic."

In the same vein, Judge Donato, in adjudicating the contempt, stated:

> I'm satisfied that during the trial and the summations of the matter that was pending before Judge Passero, [defendant], during a break, told Ms. Champion that he was going to start a suit against Ms. Champion.
>
> I find that to be a fact from the testimony of Ms. Champion, who indicated that she was aware of other litigation that this defendant had filed. That he had filed not only a civil suit against her, but a criminal case against her. And not only against her, but other individuals, including—well, a lot of individuals. Ultimately all of these suits were dismissed.
>
> . . . .
>
> I find this as a fact based on the testimony of Ms. Champion, the testimony of the Sheriff's [o]fficer ... who testified, and the State Police detective.
>
> In addition, I—I make a finding because [defendant] said, "I'll admit to it," after Ms. Champion had said, "He tells me he's going to file a civil suit against me, that I'm the next target." And the State Trooper heard him say that.
>
> . . . .
>
> [A]nd I further find that [defendant] had indicated the day before that he was going to start a suit against the wives of police officers. And I say that that was said in earshot of Ms. Gallagher, who was sitting next to her husband, Lieutenant Gallagher.
>
> First of all, ... Ms. Champion had indicated that she was going to produce Ms. Gallagher the following day. Ms. Gallagher was sitting in the courtroom next to her husband. And it was directed toward Ms. Gallagher in order to get—or at least—in order to get to her testimony or to that of Lieutenant Gallagher.

. . . .

I'm satisfied that both of these comments were made by [defendant], that they were made to Ms. Gallagher, knowing that she was the wife of a police officer. They were made to Ms. Champion at a critical point in the trial.

. . . .

[C]ontempt is a disobedience of the [c]ourt by acting in opposition to its authority, justice, and dignity. [It includes an act that] interferes with or prejudices parties during the course of litigation, or which would otherwise tend to bring the authority and administration of the law into disrepute or disregard.

. . . .

But I am satisfied that [defendant's] conduct . . . constituted contempt of the proceedings and the court in which he found himself in that it had a tendency and was about to disrupt the trial. . . .

So, I'm sustaining the contempt charges filed by Judge Passero. I am finding—adjudicating this defendant guilty of contempt of [c]ourt in attempting to—to intimidate the witness, Gallagher, and attempting to intimidate the attorney, Champion.

We agree with the trial court that defendant's conduct was contumacious. Defendant acknowledged that at the time he remarked to the Sheriff's officer that he was about "to sue the wives next," he knew that Lieutenant Gallagher was in the courtroom. The record also indicates that sitting next to the lieutenant was Mrs. Gallagher, the only woman in the courtroom aside from the City's attorney. As did the trial court, we conclude from those facts that defendant was aware that the police officer's spouse, to whom he was directing his "next" lawsuit, was within earshot of his remarks. By design or in effect, defendant's statements had an unmistakable ring of intimidation.

Courts in other jurisdictions have ruled similarly in varying contexts. See, e.g., Hirschfeld v. Superior Court, 184 Ariz. 208, 908 P.2d 22, 25–26 (Ariz.Ct.App.1995) (observing that calling out in loud voice to witness was form of harassment that lessened dignity and authority of court, and was punishable for that reason); Black v. Blount, 938 S.W.2d 394, 401 (Tenn.1996) (concluding that aggressive conduct toward jurors outside courtroom constituted obstruction of administration of justice); People v. Campbell, 123 Ill.App.3d 103, 78 Ill.Dec. 797, 462 N.E.2d 916, 922 (1984) (defendant found guilty of criminal contempt for filing civil complaint

against state's attorney and complaining witness when done for purpose of intimidating attorney).

In arguing that his conduct was not contemptuous, defendant points out that the State has not indicted him for any criminal offense. Defendant misconstrues the import of that fact. Simply because prosecutors have declined to charge defendant criminally does not ameliorate the contumacious nature of his conduct under *Rule* 1:10–2. Essentially for the reasons expressed by the trial court, we hold that defendant's second adjudication of contempt under *Rule* 1:10–2 was proper.

## IV.

In reaching our three holdings, we have undertaken a *de novo* review of the record. *R.* 2:10–4; *Matter of Duane, Morris & Heckscher LLP*, 315 *N.J.Super.* 304, 311, 718 *A.*2d 244 (App.Div. 1998). We conclude that defendant's guilt in respect of the first and third contempt adjudications has been demonstrated beyond a reasonable doubt. *In re Yengo, supra*, 84 *N.J.* at 120, 417 *A.*2d 533. We also are satisfied that given the pattern of contemptuous conduct and the careful process under which these matters were adjudicated, the respective sentences imposed on defendant are just. See *In re Daniels, supra*, 118 *N.J.* at 65, 570 *A.*2d 416 (observing that from perspective of appellate review, there is special concern when dealing with imprisonment as opposed to censure).

Without foundation, defendant repeatedly accused the trial court of fixing cases, of conspiring with adverse counsel and others to defeat defendant's claims, and of being corrupted by political influences. He made those accusations while unceasingly seeking the disqualification of the judge. He also was found to have attempted to intimidate a witness and opposing counsel. We can imagine few acts more defiant of the court's authority or assaultive to its dignity than those committed by defendant. Although we do not relish seeing a litigant incarcerated for contempt, regrettably in this case such "punishment is essential to prevent 'demoralization of the court's authority ... before the public.'" *In re Oliver*,

333 *U.S.* 257, 275, 68 *S.Ct.* 499, 509, 92 *L.Ed.* 682, 695 (1948) (quoting *Cooke, supra,* 267 *U.S.* at 536, 45 *S.Ct.* at 394–95, 69 *L.Ed.* at 773).

## V.

The judgment of the Appellate Division is affirmed in part, reversed in part. The matter is remanded to the trial court for execution of the sentences and such further proceedings as are consistent with this opinion.

*For affirming in part/reversing in part/remanding*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.