863 A.2d 1059 (2005)
374 N.J. Super. 116
Diane PETERSON, Plaintiff-Respondent,
v.
Glenwood PETERSON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted November 16, 2004.
Decided January 3, 2005.
Glenwood Peterson, appellant pro se.
Respondent did not file a brief.[1]
Before Judges STERN, GRAVES and LANDAU.
The opinion of the court was delivered by
GRAVES, J.A.D.
This is a domestic violence case. Defendant, Glenwood Peterson, appeals from a final restraining order entered against him and in favor of his wife, Diane Peterson. Defendant contends that he did not receive a fair trial and the evidence was insufficient to warrant the issuance of a final restraining order. Based on our careful review of the entire record, we reverse and remand for a new trial.
The domestic violence complaint, signed by plaintiff on June 4, 2003, alleged acts of harassment on June 1, 2003, that endangered plaintiff's life, health, or well-being. *1060 The complaint specified that defendant committed the following acts:
Defendant started screaming at plaintiff getting in her face and intimidating her/called her "bitch, whore," etc. Defendant made plaintiff get in car and go to dinner with their daughter. Plaintiff was sick with stomach pains/diarrhea and defendant refused to take plaintiff for 1/2 hour. On a daily basis, defendant gets into plaintiff's face, towering over her screaming and using profanities, causing plaintiff to become very scared and nervous. Defendant is 6' 7" and over 300 pounds. Plaintiff fled with child in fear of her safety.
The domestic violence complaint also alleged a history of domestic violence consisting of the following:
Defendant has threatened to kill plaintiff numerous times, screams in her face and curses her weekly. Prior to 1998, defendant was very physically abusive to plaintiff. Couple of months ago, defendant threw plaintiff off the bed. Has threatened plaintiff by stating that he could do what O.J. did to his wife. Defendant sat on plaintiff's back which required medical attention.
On June 13, 2003, the parties appeared for a final hearing without attorneys. A neighbor, Ms. DeCesare, was present to testify on behalf of plaintiff, and defendant had two witnesses: his mother, Bonnie Peterson, who resided with the parties, and a friend, Benjamin Powell. Prior to the hearing, plaintiff, defendant, and the three potential witnesses were all sworn. The hearing was conducted informally with the trial court asking the questions. Neither party was afforded an opportunity to conduct cross-examination, and Mr. Peterson's witnesses did not testify. When the judge asked plaintiff what happened on June 1, 2003, she testified as follows:
[H]e came into the kitchen and he's asking me, well, he's demanding some knives that he had bought. And they're kitchen knives. It's just that they're sharp....
And I said to him, when he started demanding the knives and harassing me about the knives,  because when my husband harasses me, my husband comes in front of my face and towers over me, stands over me. And he's yelling and screaming, and he calls me all kinds of nasty names like four-letter whore, crazy bitch, all kinds of sick stuff he says to me, and he's towering over me.
And when I tried to just turn away to avoid any kind of confrontation or discord  attitude or action ..., he follows me. If I turn to the left, he steps in front of me. If I turn to the right, he steps in front of me. So I am actually forced to stand still.
....
So five, six times I said the same thing; what do you want the knives for? And eventually he kept on demanding and eventually he says to me, well just in case if you're not here I know where to find them.
Okay. I walked out after that, you know, I just left them in the kitchen because I'm not playing around with any knives....
....
... I came back downstairs and I went to the kitchen and he says to me he's demanding let's go out for dinner, for lunch....
....
... And I said to him, I don't feel well, because I really wasn't feeling well. I felt sick to the stomach. I was nervous. I was scared. You know.
[THE COURT:] What were you nervous and scared about?

*1061 [PLAINTIFF:] Because we have an episode of violence. We've had, you now, lots of, he's always harassing me. Even the night before, which was May 31st, he's harassing me about some pictures he thinks that I take....
....
I had an incident in, domestic violence incident, in '98. I got hurt. I ended up having to go in the ambulance to the emergency room....
....
[THE COURT:] Did he threaten you with the knife? Did he use the knife on you? Did he threaten you with the knife? Did he take the knife out and threaten you or menace you?
[PLAINTIFF:] He did it before. I'm not bothering with knives.
[THE COURT:] Did he do it on June 1st? Yes or no?
[PLAINTIFF:] No. He didn't threaten me with the knife.
[THE COURT:] So what's the problem here? What's the act of domestic violence that I'm missing?
[PLAINTIFF:] Because, Your Honor, there [are] so many episodes about this harassment. My husband comes before me and towers over me.
After hearing from both plaintiff and the neighbor, the trial court stated: "Okay. I think I understand.... What do you have to say, Mr. Peterson?" Defendant answered as follows:
The knife incident, what happened in the past; I go buy certain things, and I look for, you know, they end up missing. And I was telling her if she go out of town or something and I do barbecue. Maybe I barbecue too much because I'm too big. But I do barbecue a lot. It's one of those knives that cut through anything.
....
But I never have threatened her with a knife....
[THE COURT:] Do you call her names? Do you have fights with her verbally?
[DEFENDANT:] I will agree.
[THE COURT:] Do you intimidate her?
[DEFENDANT:] No. Okay.
[THE COURT:] You intimidate me just by your physical presence. I don't mean that negatively. You're a big guy.
[DEFENDANT:] I know, but what I'm trying to say is ... that she picks arguments with me and she come[s and] tell[s] me well, people look at you and see you [are] big and tall, and I cannot sit on nobody without crushing their bones because I'm 300 pounds....
[THE COURT:] Should the two of you be living together or not?
[DEFENDANT:] Sir, what happened, I don't know.... I'm laying in my bedroom sleeping when she say[s] all the incidents are happening and she come[s] in and hit[s] me with a pillow. And my daughter, you know, our daughter come[s] and we're playing pillow fight.
And then the next thing I know she's filing a complaint against me.... And can I comment on the last incident that she said happened, sir?
[THE COURT:] Sure. I want you to.
[DEFENDANT:] Okay. June 1st. What she said [is] totally not correct and [there is] a little bit more added to it because the day before we went to this Indian restaurant in Long Branch.... And she loves the restaurant. Our daughter loves the restaurant. And we [were] having a good time.
... Then Sunday morning I told her ... I [have] to start my diet soon, and I got up and I [said] ... I'd like to go to, does everybody want to go to the Indian restaurant? And she said okay. And *1062 our daughter, you know, quickly jumped in her clothes and we both were sitting in the car waiting on her.
There [were] no arguments because she hopped in the car with us to go to the restaurant and my mother was upstairs.... She came down and I told her ... I was getting ready to take my daughter and my wife out for dinner.... I told her I'd be back in a little while.
So if you look in her report, she claims that I drove around for 20 minutes and she had diarrhea and I would not stop to let her use the rest room. That is not true. What happened was, 
[THE COURT:] The issue is not driving around for 20 minutes not letting her use the, 
[DEFENDANT:] I know, but that's what she complained was my abuse against her on the report, sir....
[THE COURT:] I think what she's saying to me, and you can correct me if I'm wrong, is that over a period of five or six years, she has perceived [there] to be a pattern of intimidation by you to the point where she just can't live that way anymore. And she's afraid. Isn't that what you're saying?
[PLAINTIFF:] That's exactly right. I'm afraid. He has threatened me many times before. And I know. I see, what happened, he walked in the room Tuesday. He has a tendency to wake me up one o'clock, two o'clock in the morning. And he walked in that morning and he shook me forcefully and said something to me and walked out. I don't even know what it was he said....
[THE COURT:] Is that correct?
[DEFENDANT:] That's not correct, sir.
[PLAINTIFF:] That is correct.
As part of his notice of motion for reconsideration, defendant submitted a copy of a police report regarding the "domestic violence incident in 1998." A portion of that report dated July 6, 1998, contains plaintiff's statement that defendant "pushed her down, then sat on her." The police report includes the following narrative:
Mr. Peterson states his wife fell when she attempted to leave the home with their daughter Bonnie. Mr. Peterson states he grabbed Bonnie's arm and a pot of water fell off the stove and he and his wife slipped and he landed on top of her.
Mr. Peterson's mother confirmed this version of events. It should be noted there was a spilled pot of water and beans on the floor of the kitchen. There were no obvious signs of physical injury to the victim at this time. Neither party wished to endorse complaints or wished for a restraining order. It should be noted Mr. Peterson stated at no time did his wife become hostile towards him and did not assault him.
Our role in reviewing the trial court's decision is limited. A reviewing court is bound by the trial court's findings "when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412, 713 A.2d 390 (1998) (citing Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974)). Generally, we give particular deference to matrimonial courts because they "possess special expertise in the field of domestic relations." Id. at 412-13, 713 A.2d 390 (citing Brennan v. Orban, 145 N.J. 282, 300-01, 678 A.2d 667 (1996)). Because of the conflicting testimony presented at the domestic violence hearing on June 13, 2003, it was incumbent upon the trial court to make appropriate credibility determinations. Our review is hampered because the trial court failed to resolve the credibility contest and also failed to make any specific finding that domestic violence had occurred. N.J.S.A. 2C:25-29; R. 5:7A(d) *1063 ("[a] final order restraining a defendant shall be issued only on a specific finding of domestic violence or on a stipulation by a defendant to the commission of an act or acts of domestic violence as defined by the statute").
In this case, the final restraining order was issued to provide the parties, and their daughter, with an "interim solution" because the trial court thought it was "the right thing to do."
[THE COURT:] Unfortunately, I'm in a situation where I see people who are all credible to me. You seem like a very smart, nice man. She seems like a very smart, nice lady. I'm sure this gentleman is going to stand up and say what a wonderful guy you are. Okay, or he wouldn't be here. You wouldn't bring somebody who is going to say he's not a nice guy.
I'm sure your mom is going to say you're a nice guy. But where I have to, if I have to make a mistake I have to make a mistake in favor of safety. Do you understand that? Because, let me tell you something right now. Aside from the fact that I'm a judge, I'm a human being. And if I make a mistake that's going to hurt somebody, I'll never forgive myself.
So if you were in my situation and I can't really tell who's being credible or not credible here, I can just tell you that you shouldn't live together right now. If you want to eventually get involved in some counseling, if you want to do it, that's a whole bunch of different things. But right now, this lady needs a time to feel safe and cool off and get her feet back on the ground, and your daughter needs the same thing.
My view is that she should move back into the house. You should move out of the house, find your own place, and get on with your lives, and hopefully you'll get a lawyer; she'll get a lawyer, and through the lawyers they'll negotiate. Maybe you can go to counseling. Maybe you'll get divorced. Maybe you'll get back together. I don't know. But this is an interim solution, because I think that if I say that there was no domestic violence, although I don't think you intentionally did anything to harm anybody.... It's going to be a psychological disaster.... I have no problem in entering the order ... not because you are a bad guy, because it's the right thing to do.
The domestic violence complaint signed by plaintiff alleged harassment, a predicate offense for a domestic violence restraining order. N.J.S.A. 2C:25-19(a)(13). Prior to the issuance of a final restraining order, the allegations in the domestic violence complaint must be proven by a preponderance of the credible evidence. N.J.S.A. 2C:25-29(a). The relevant portion of the harassment statute reads as follows:
[A] person commits a petty disorderly persons offense if, with purpose to harass another, he:
a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
[N.J.S.A. 2C:33-4 (emphasis added).]
For the court to have issued the final restraining order on June 13, 2003, it was necessary for plaintiff to have proven, by a preponderance of the credible evidence, that defendant committed one of the three *1064 "free-standing" offenses, outlined in the harassment statute, with the requisite intent. State v. Hoffman, 149 N.J. 564, 576, 695 A.2d 236 (1997) (quoting State v. Mortimer, 135 N.J. 517, 525, 641 A.2d 257, cert. denied, 513 U.S. 970, 115 S.Ct. 440, 130 L.Ed.2d 351 (1994)).
"[C]ourts must consider the totality of the circumstances to determine whether the harassment statute has been violated." Cesare, supra, 154 N.J. at 404, 713 A.2d 390 (citing Hoffman, supra, 149 N.J. at 584-85, 695 A.2d 236). In some cases, "a finding of a purpose to harass may be inferred from the evidence presented" and from "[c]ommon sense and experience." Hoffman, supra, 149 N.J. at 577, 695 A.2d 236 (citations omitted). In this case, however, there was no finding that defendant acted with a purpose or intent to harass plaintiff, even though "such a finding is integral" to a determination of harassment. Bresocnik v. Gallegos, 367 N.J.Super. 178, 183, 842 A.2d 276 (App.Div.2004) (citing E.K. v. G.K., 241 N.J.Super. 567, 570, 575 A.2d 883 (App.Div.1990)). On the contrary, the trial court specifically determined that defendant did not "intentionally [do] anything to harm anybody." Accordingly, the record fails to demonstrate that a final restraining order was necessary "to prevent further abuse." N.J.S.A. 2C:25-29(b).
The issuance of a final domestic violence restraining order "has serious consequences to the personal and professional lives of those who are found guilty of what the Legislature has characterized as `a serious crime against society.'" Bresocnik, supra, 367 N.J.Super. at 181, 842 A.2d 276 (quoting N.J.S.A. 2C:25-18). Once a final restraining order is entered, a defendant is subject to fingerprinting, N.J.S.A. 53:1-15, and the Administrative Office of the Courts maintains a central registry of all persons who have had domestic violence restraining orders entered against them, N.J.S.A. 2C:25-34. Violation of a restraining order constitutes contempt, and a second or subsequent nonindictable domestic violence contempt offense requires a minimum term of thirty days imprisonment. N.J.S.A. 2C:25-30. The issuing court may also impose a number of other wide-reaching sanctions impairing a defendant's interests in liberty and freedom in order "to prevent further abuse." N.J.S.A. 2C:25-29(b).
We are mindful of the heavy burden on Family Part judges, Brennan, supra, 145 N.J. at 304, 678 A.2d 667, and the "burgeoning domestic violence case-load in the Superior Court," Smith v. Moore, 298 N.J.Super. 121, 123, 689 A.2d 145 (App.Div.1997). But we are troubled by the informality of the proceedings and the failure to afford defendant essential procedural safeguards including the right to cross-examine adverse witnesses and the right to call witnesses in his own defense.
"Our system is committed to a search for truth within the context of the adversary system. Over the years that system has provided a reliable measure of justice." Graham v. Gielchinsky, 126 N.J. 361, 373, 599 A.2d 149 (1991). A "trial, although inevitably an adversarial proceeding, is above all else a search for truth," State v. Fort, 101 N.J. 123, 131, 501 A.2d 140 (1985), and we have recognized that "[c]ross-examination is the most effective device known to our trial procedure for seeking the truth." Tancredi v. Tancredi, 101 N.J.Super. 259, 262, 244 A.2d 139 (App.Div.1968) (quoting First Nat'l Bank of Freehold v. Viviani, 60 N.J.Super. 221, 225, 158 A.2d 704 (App.Div.1960)).
Unfortunately, the procedure resorted to by the trial court did not afford defendant an opportunity to cross-examine his wife, or the neighbor Ms. DeCesare, and it is clear that he was unaware of his right to do so. On appeal, defendant argues that *1065 "the judge showed bias and did not cross-examine for not telling the truth." Furthermore, in the absence of this critical safeguard, "the integrity of the fact-finding process" was compromised because the trial court was unable to fully and fairly assess credibility. Kentucky v. Stincer, 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631 (1987) (quoting Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)); see Amoresano v. Laufgas, 171 N.J. 532, 557, 796 A.2d 164 (2002) (citation omitted).
Nor was defendant permitted to present his own witnesses, even though defendant's mother and his friend were both present in court for the purpose of testifying. Defendant's mother not only lived with plaintiff and defendant at the time of the alleged acts of domestic violence, but she also witnessed the disputed incident in 1998, and her testimony may have aided the trial court in making the necessary credibility and factual determinations. Furthermore, as a matter of fundamental fairness, defendant had the right to present witnesses in his defense. Cardell, Inc. v. Piscatelli, 277 N.J.Super. 149, 155, 649 A.2d 107 (App.Div.1994) (quoting 98 C.J.S. Witnesses § 315 (Supp.1994)) (noting that "[t]he right to present witnesses is `an essential element in the conduct of a trial'").
In view of the foregoing, we are convinced that defendant's notice of motion for reconsideration should have been granted. The trial court undoubtedly exercised its judgment with the best of intentions; however, we are unable to determine to what extent plaintiff's domestic violence claims might have been successfully challenged if defendant had not been deprived of his constitutional right to due process and a fair trial.
Reversed and remanded for a new trial. We direct the trial court to proceed as expeditiously as possible. We do not retain jurisdiction.
NOTES
[1] Respondent submitted a letter that stated: "I do not wish to participate in the appeal but I wish to rely on the record below."