THE UNION COUNTY PARK COMMISSION, PLAINTIFF-AP-
PELLANT, v. THE BOARD OF CHOSEN FREEHOLDERS
OF THE COUNTY OF UNION AND ARTHUR N. PIERSON,
COUNTY TREASURER OF UNION COUNTY, DEFEND-
ANTS-RESPONDENTS.

Argued October 17, 1949—Decided October 31, 1949.

74

*Mr. David Armstrong* argued the cause for the appellant.

*Mr. Clarence A. Ward* argued the cause for the respondents.

The opinion of the court was delivered by

VANDERBILT, C. J. In December, 1948, the plaintiff, The Union County Park Commission, following its uniform practice since its organization in 1921, by resolution requisitioned the defendant, The Board of Chosen Freeholders of the County of Union, for the sum of $400,000 for capital expenditures for park improvements, such funds to be raised by the issuance of bonds of Union County. The Board of Chosen Freeholders declined to honor the requisition and, after several months of negotiation, offered to issue $200,000 in bonds, an offer that the Park Commission refused to accept. The present action in lieu of a prerogative writ was commenced in March, 1949, by the Park Commission to compel the Board of Chosen Freeholders to take the necessary action prerequisite to the issuance of $400,000 of county bonds and to turn the proceeds over to the plaintiff. The trial judge entered an order requiring the Board of Chosen Freeholders to issue

immediately capital park bonds in the amount of $200,000 and pay over the funds to the Park Commission and directing that the question as to whether or not the other $200,000 should be borrowed should be submitted to the voters of Union County on a referendum at the next general election. From this order an appeal and a cross appeal were taken to the Appellate Division of the Superior Court. The matter now comes before us on our own certification.

The Union County Park Commission was organized in 1921 under the provisions of *P. L.* 1895, *c.* 91, after a referendum submitted to the voters of Union County and it is now governed by the provisions of *R. S.* 40:37–96 to 40:37–174, inclusive. The Act of 1895 authorized the raising of funds by bond issues in the name and on the credit of the county in a sum not exceeding $2,500,000. Thereafter over the years a number of supplements to the 1895 Act were passed by the Legislature authorizing the raising of additional sums through bond issues in varying amounts ranging from $50,000 to $5,000,000. There were twenty of such acts, all saved from repeal at the time of the adoption of the Revised Statutes of 1937 by the provisions of *R. S.* 40:37–130, ten of which require approval on referendum to the voters before becoming effective, five others requiring no referendum but authorizing the incurrence of indebtedness only if previous sums in prior acts have all been authorized, and the remaining five not requiring referendum and in effect providing a blanket authorization for the borrowing of additional sums up to the amounts therein authorized. It is conceded by both sides that the requisition in question was made under the authority of the five acts last mentioned (which, it is important to reiterate, are not subject to referendum to the voters) and that the requisition here made together with all other requisitions of the Park Commission upon the Board of Chosen Freeholders does not exceed the aggregate sum authorized in the five acts.

Thus. the single issue presented in this case is whether the Board of Chosen Freeholders is under a mandatory obligation to raise funds by borrowing and to issue county bonds to meet the amount or amounts requisitioned by the Park Commission

when such requisitions are within the sums authorized to be spent by statute. The problem is one of applying the pertinent statutes to undisputed facts.

R. S. 40:37–131, the section immediately following the sections dealing with the original authorization of a bond issue of $2,500,000 (R. S. 40:37–129) and saving from repeal the several supplementary statutes authorizing the additional capital funds above referred to (R. S. 40:37–130), provides:

"Such bonds shall be issued in accordance with the provisions of article 1 of chapter 1 of this title (§ 40:1–1 et seq.). The interest and principal of all such bonds issued under the authority of sections 40:37–96 to 40:37–174 of this title shall be the debt or obligation of the county wherein they are issued, and the payment thereof shall be provided for by taxation in the same manner as other debts and obligations of the county."

On referring to R. S. 40:1–1 et seq., it will be found that these sections set forth various provisions, all restrictive in nature, governing the authorization and issuance of bonds by counties and municipalities. For example, R. S. 40:1–18 sets forth in minute detail the various steps which must be followed in the adoption of an ordinance or resolution authorizing the issuance of bonds requiring, among other things, that the resolution be published at least one week prior to the second reading, that at the second hearing it shall be read in full and "all persons interested shall be given an opportunity to be heard," after which the "governing body may * * * finally pass or reject such resolution." Again, R. S. 40:1–9 provides that no bond resolution may be adopted except upon the "affirmative votes of at least two-thirds of all the members of the governing body;" and R. S. 40:1–14 imposes a debt limit on the counties, to which indebtedness for park purposes does not constitute an exception. In the light of the foregoing restrictions upon the Board of Chosen Freeholders in borrowing funds, and reading them in pari materia with R. S. 40:37–130 and 131, dealing with the Park Commission, it is inescapable that the Legislature intended that the Board of Chosen Freeholders not only be permitted to exercise its own discretion as to whether or not it will

approve in whole or in part a requisition upon it by the Park Commission, but that it is affirmatively required to do so.

This conclusion is re-enforced by the provisions and language of the five authorizing acts that are here involved, *P. L.* 1913, *c.* 152; *P. L.* 1914, *c.* 140; *P. L.* 1920, *c.* 59; *P. L.* 1921, *c.* 70; *P. L.* 1924, *c.* 55. The 1913 and 1914 acts are in substantially the same language and provide that "the board of chosen freeholders *may* from time to time * * * on the requisition of said board of park commissioners * * * borrow money by issuing the bonds of the said county to a sum not exceeding, in the aggregate" the sums therein authorized. The acts of 1920, 1921 and 1924 all provide in substantially the same language that "the board of chosen freeholders *shall,* from time to time * * * borrow money by issuing the bonds of the said county to a sum not exceeding in the aggregate" the various sums authorized, but require further that "such bonds shall be issued in accordance with" the provisions of *P. L.* 1916, *c.* 252, which was a precursor of and contains provisions similar to those found in *R. S.* 40:1-1 *et seq.*, previously cited herein. Manifestly the use of the word "may" in the acts of 1913 and 1914 and the use of the word "shall" in the acts of 1920, 1921 and 1924, in conjunction with the further provisions conditioning the issuance of the bonds upon a compliance with the municipal and county bond act (*P. L.* 1916, *c.* 252), demonstrates clearly that the Legislature intended the incurring of indebtedness on the part of the County under these acts to be subject to the discretion of the governing body of the county, the Board of Chosen Freeholders.

■ It is urged by the Park Commission that the action of the voters of Union County in adopting the Act of 1895 (*R. S.* 40:37-96 to 40:37-174), authorizing the establishment of a county park commission, operated as a mandate from the people of Union County with respect to the funds theretofore authorized and which might thereafter be authorized by the Legislature to be raised by the County for capital purposes, with which the Board of Chosen Freeholders may not interfere. It insists that if the sections of *R. S.* 40:1-1 *et*

*seq.* be construed so as to make the appropriation and raising of such funds subject to the discretion of the governing body of the County, these sections are unconstitutional under the principle that invalidates statutes "which cannot take effect through the exercise of a discretion or of a will intervening between the legislature and the voter," *Attorney General v. McGuinness,* 78 *N. J. L.* 346 (*E. & A.* 1910). This argument might be of some merit if the statutes involved here had authorized a referendum, and if the voters had approved such a referendum, and if there had been funds available at least sufficient to cover the requisition, but such a situation does not here exist. By the terms of *R. S.* 40:37–170, all that the voters could pass on at the referendum concerning the establishment of a county park commission was whether the County should "establish a county park commission pursuant to" *R. S.* 40:37–96 to 40:37–174. The submission and adoption of this single question could not conceivably have the effect suggested by the plaintiff Park Commission. This conclusion is buttressed by pointing to the single fact that, were it otherwise, the provisions of those of the supplementary statutes providing for funds for capital expenditures requiring submission on referendum would be rendered meaningless.

Looking at the legislative scheme for providing capital funds for parks, it is evident that it was the uniform design of the Legislature to place the ultimate control of such appropriations to the Park Commission in the electorate either directly through the device of a referendum or indirectly through its elected representatives, the members of the Board of Chosen Freeholders. This design is apparent throughout the varying provisions of the twenty different acts relating to capital expenditures. Indeed, the legislative plan as a matter of fact extends as well to the funds to be made available by the County for purposes of park maintenance. Thus, it is provided that if the proposition is put to and accepted by the voters of the County, *R. S.* 40:37–12 and 13, the Board of Chosen Freeholders is annually required to budget and raise for maintenance of the county park system "not less than one-half of one mill on the dollar, nor more than three-

fourths of one mill on the dollar of the assessed valuation of the taxables and ratables of the county," except where the Park Commission shall certify "that an amount less than the minimum * * * is needed," *R. S.* 40:37–14. On the other hand, if the voters of the County shall have rejected the foregoing sections, the Board of Chosen Freeholders "upon the written request of the county park commission * * * for funds for the maintenance of said county park commission, after a public hearing on said request, and after determining *in their discretion* that funds for the maintenance of said county park system are necessary, *may* hereafter annually appropriate funds for the maintenance of said county park system," except that the funds raised and appropriated "shall not exceed one-half of one mill on the dollar on the assessed valuation on the total ratables and taxables in said county," *R. S.* 40:37–101.1.

A more convincing expression of the legislative intent could not be had. Its underlying rationale is not only obvious but eminently sound. The members of the Park Commission were originally appointed by the Justice of the former Supreme Court presiding in the County, *R. S.* 40:37–97, 98, for terms of five years. They are now appointed by the Chief Justice of the Supreme Court, *New Jersey Constitution, Art. XI, Sec. IV, par.* 10; *R. S. Cum. Supp.* (1948) 1:1–22. They do not hold office through any mandate of the people of the County nor are they directly responsible to them. Were the position here contended for by the Park Commission the law of the State, it might pursue a course directly contrary to the wishes and welfare of the voters for a period of years until the respective terms of a majority of the Commissioners had expired and the appointing power had been prevailed upon to make other appointments. In the instant case if we were to accept the position of the Park Commission, it might presently requisition the Board of Chosen Freeholders for over $2,000,000 instead of $400,000 as a matter of right. That the Park Commission has established and is maintaining one of the finest, and per capita the largest, county park system within the State and in so doing has

made judicious and efficient use of the funds that have been granted to it does not alter the desirability of the legislative policy of committing the power to authorize the expenditure of funds either to the people themselves through the device of a referendum or to the duly elected officers of the County, who are periodically called upon to justify their stewardship. The latter is a traditional concept in this country at national, state and local levels. Nor does the legislative scheme in anywise impinge upon the highly desirable autonomy of the Park Commission in the exercise of its statutory functions once funds are appropriated to it. The Park Commission, and the Park Commission alone, is empowered to decide how its funds shall be best expended.

The judgment below is reversed and the defendant Board of Chosen Freeholders is directed to introduce and to consider a resolution to raise by borrowing the sum of $400,000 for capital expenditures for park improvements.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For affirmance*—None.