796 A.2d 257

WARREN COUNTY COMMUNITY COLLEGE, PLAINTIFF–RE-
SPONDENT, v. WARREN COUNTY BOARD OF CHOSEN
FREEHOLDERS, DEFENDANT–APPELLANT.

IN THE MATTER OF THE WARREN COUNTY BOARD
OF CHOSEN FREEHOLDERS CHARGED WITH
CONTEMPT OF COURT.

Superior Court of New Jersey
Appellate Division

Submitted January 28, 2002—Decided February 14, 2002.

Before Judges PETRELLA, STEINBERG and ALLEY.

*Joseph J. Bell & Associates*, attorneys for appellant (*Nancy C. Gage*, on the brief in A5697–00T3 and *Joseph J. Bell*, on the brief in A–105–01T3).

*Sills Cummis Radin Tischman Epstein & Gross*, attorneys for respondent Warren Community College (*Philip E. Stern*, of counsel and on the briefs; *Ruth M. Ruggero*, also on the briefs).

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

The Warren County Board of Chosen Freeholders (the Board) appeals from orders of the Law Division directing the Board to appropriate funds for a Warren County Community College [1]

---

[1] The community college was established originally by the County Freeholders in 1981 as the Warren County Community College Agency under *N.J.S.A.* 18A:64A–30 *et seq.* The change to college status under *N.J.S.A.* 18A:64A was not accomplished statutorily but by resolution of the Board of Higher Education. The Warren County Community College Agency petitioned the State Board of Higher Education for a change of name and status to Warren County Community College, perhaps in relation to an anticipated accreditation review, and this change in status was approved by the State Board by resolution on January 24, 1992, but without any official action by the Board of Freeholders or any referendum. Defendant maintains that the commission was thus not properly established as a county college under the statute because the provisions of

494

(College) capital project and a separate order of contempt and sanctions against two Freeholders, personally. These appeals, which we consolidated for purposes of this opinion, raise issues of the power of the Legislature to delegate its taxing authority to non-elected boards, and the use of a court's contempt powers against individual public officials (here Freeholders) who are members of the Board in order to compel them to cast a vote to either authorize a bond issue or raise the necessary funds for the College's capital project, to construct what is generally described as a community center.

The effect of compelling an affirmative vote on the College's proposal is to require the Board on behalf of the County to request funds by applying to the County Tax Board to have the municipalities in the county raise the funds through the property tax assessment route.

For the reasons hereinafter stated, we reverse the order of the Law Division that erroneously found applicable and mandatory in this case the provisions of *N.J.S.A.* 18A:64A–15. We also hold that the judge erred on both procedural and substantive grounds in sanctioning two of the three individual Freeholders personally for declining to vote to appropriate funds or issue bonds. We reverse the contempt order and sanctions.

On November 19, 1998, the College Board of Trustees (Trustees) adopted a resolution, by a vote of seven to four, proposing the construction of a community center as proposed in a facilities master plan with an estimated revised cost of $4,143,278. The Trustees adopted this resolution after a non-binding referendum of the county's voters had disapproved of the capital funding

---

*N.J.S.A.* 18A:64A–2 through 5, including a referendum requirement, were not complied with to obtain status as a college. This is significant because the statute creating boards of school estimate appears to apply only to colleges, and not to county college commissions. There is and has not been any challenge to the *de facto* existence of the college, although the Law Division Judge seemed concerned about that possibility. Our decision has no bearing on the *de facto* existence of this educational institution. See discussion, *infra.*

project. The Trustees' resolution referred to New Jersey's Chapter 12[2] program, *N.J.S.A.* 18A:64A–22.1 *et seq.*, that provides matching State funds for construction projects for county colleges[3] on a first come, first served basis.

In accordance with *N.J.S.A.* 18A:64A–17, the Trustees forwarded the resolution to the College's board of school estimate established under *N.J.S.A.* 18A:64A–15 for each county college and consisting of "the chairman of the board of chosen freeholders, two members of the board of chosen freeholders appointed by that board and two members of the board of trustees appointed by that board." In Warren County there are only three Freeholders. Consequently, all of its Freeholders sit on the College's board of school estimate.

On February 10, 1999, the board of school estimate, by a three to two vote, certified the amount requested by the College as $4,140,720. This figure included anticipated 50% matching funds from the State under Chapter 12. The certificate was signed by three board of school estimate members, consisting of one Freeholder and two trustees. The two other members of the Board disapproved.

---

[2] This refers to *L.* 1971, *c.* 12.

[3] A county college is defined as:

an education institution established or to be established by one or more counties, offering programs of instruction, extending not more than two years beyond the high school, which may include but need not be limited to specialized or comprehensive curriculums, including college credit transfer courses, terminal courses in the liberal arts and sciences, and technical institute type programs.

*N.J.S.A.* 18A:64A–1(c). The means of establishing a county college are explained in *N.J.S.A.* 18A:64A–2 through 6. Under this definition the College might not qualify because it was not established by the Board as a college, but only as a county community college agency (*N.J.S.A.* 18A:64A–30), which is governed by a commission, *see N.J.S.A.* 18A:64A–31 and 32, which would seek funding by recommending that the necessary funds be included in the county's budget. *See N.J.S.A.* 18A:64A–36.

A certificate was then sent to the Board pursuant to *N.J.S.A.* 18A:64A–19(1). The Board rejected a resolution to hire counsel to prepare a bond ordinance by a vote of two to one. The two Freeholders who voted against the project also voted against hiring counsel to draft the ordinance. The College then sought an order to show cause in the Law Division why the Board should not be directed to appropriate the $4,140,720 necessary for the capital project pursuant to *N.J.S.A.* 18A:64A–19(2).[4] At a May 5, 1999 court hearing the Board took the position that because the Trustees' resolution called for Chapter 12 funding it was necessary to raise the money through a bond issue. In addition, they argued that despite the language of *N.J.S.A.* 18A:64A–19(2), that a county "shall" raise revenue through taxation or bonds upon receiving a certificate from the board of school estimate, the County cannot be compelled to issue bonds. Because only bonding would qualify the County for Chapter 12 matching funds, the Board would have had to proceed under the local bonding laws which recognize the inherent discretion reposed in a public entity. The Board thus argued it could not be compelled to make an appropriation.

The judge ordered the Board to proceed with the process of issuing bonds, although he did not order the Freeholders to approve a bonding ordinance.

The Board also argued that even if the statute requiring appropriation upon receipt of a board of school estimate's certificate is facially constitutional, it yields an unconstitutional result in its application in Warren County due to the unique nature of its

---

[4] The statute reads in pertinent part:

(2) The board of chosen freeholders of a participating county upon receipt of any such certificate shall appropriate the amount certified therein for the purpose therein specified, ... either:

(a) By the method provided for in *N.J.S.* 18A:64A–18; or

(b) By a bond ordinance authorizing the issuance of bonds or notes of the county to finance such appropriation and purpose adopted in accordance with the limitations and any exceptions thereto, and in the manner or mode of procedure, prescribed by the local bond law, and the sale and issuance of said bonds or notes pursuant to the local bond law.

Board. We agree, but also conclude that the self-generated transmogrification of the Community College Agency into a county college and acquisition of eminent domain powers also raised an issue of whether the College is entitled to college status insofar as such status gave more authority than to merely make budget recommendations under *N.J.S.A.* 18A:64A–36, as would be the case for a community college agency (*see N.J.S.A.* 18A:64A–30 *et seq.*)[5] and then generally following the procedures in *N.J.S.A.* 18A:64A–17. The statutory sections applicable to county colleges appear to confer greater budget power to a board of school estimate where a county college is established under *N.J.S.A.* 18A:64A–2[6] by specific action of the Board. In effect what occurred is that the College raised itself to a superior position than that conferred by the public entity that created it.

The Trustees then adopted another resolution on May 28, 1999, this time by a vote of six to five, and sent its request to a "board of school estimate" for $4,140,720 without specifically mentioning the Chapter 12 matching funds program. The board of school estimate voted to approve the expenditure on June 16, 1999, by the same three to two vote that had been cast on February 10, 1999. A certificate for $4,140,720 was signed by the two trustees and only one of the three Freeholders. It was forwarded to the Board on June 25, 1999, but the Board took no action on the issue at its meetings of July 14, July 28, August 11, and August 25, 1999. The College then filed another complaint on September 2, 1999, and moved for summary judgment to compel action.

At the arguments on the College's motion the Board took the position that there were factual issues in dispute, specifically, whether the Trustees and members of the board of school esti-

---

[5] *See L.* 1974, *c.* 89. This statute specifically states that where a board of chosen freeholders of a county "has not established a county college it may, with the consent of the Commissioner on [*sic* ] Higher Education, establish a community college agency."

[6] Originally enacted by *L.* 1967, *c.* 271.

mate who approved the new resolution intended the funds to be raised through tax increases. Despite lack of reference in the new resolution to Chapter 12, the Board contended that the project was always intended to be financed in part under that law, and thus bonding was the only way to raise the funds. In the alternative, the Board claimed that if a tax increase was needed, it would have to be done as an emergency appropriation, also a discretionary action, and the Board could not be compelled to exercise that discretion. As a third alternative, the Board claimed that the statute requiring appropriation by the Board upon the certificate of a non-elected body violated the State constitution's "no taxation without representation" principles. The motion judge found no material fact issues in dispute and ordered the Board on October 14, 1999 to appropriate the necessary funds by November 13, 1999. The judge did not address the constitutional issues that had been raised.

The parties apparently agreed to extend the deadline to January 31, 2000, because an election for the office of freeholder had taken place and a new Freeholder would assume office on January 1, 2000 with an apparent change in party control. It was anticipated that the new majority of the Board of Chosen Freeholders would approve moving ahead with the bonding and Chapter 12 application. On January 26, 2000, Ann Stone, the new Freeholder Director, sent a letter of intent to the State Treasurer concerning a request for Chapter 12 funding for the College's construction project from the State and expressing an intention to sell bonds by August 30, 2001, contingent on State approval and the timetable adopted by the State Treasurer. The State approved the Chapter 12 request on May 2, 2000 with a requirement that the bonds be sold by August 30, 2002.

However, the Board elected not to take any action at that time. On March 6, 2001, the College moved under R. 1:10–3 to compel the Board to comply with the October 14, 1999 order. At argument on the motion on March 30, 2001, the Board took the position that because the State set a deadline of August 30, 2002 to issue

the bonds, the Board was under no obligation to act until then. The Board also argued on May 25, July 2, and August 16, 2001, that the College had not properly achieved county college status (compare *N.J.S.A.* 18A:64A–2 and *N.J.S.A.* 18A:64A–30) and hence could not rely on the certificate by the College's board of school estimate as the judge did not rule on this issue, but seemed of the view that there was a college in existence and this might be an attempt to dissolve it. The practical effect would be at most that *de jure* the college was still a county "community college agency" and not entitled to the full benefit of board of estimate statutes and procedures for budgetary purposes. It would still *de facto* be an educational institution, and presumably able to use the term college in its name, unless changed or prohibited.

The College pressed its argument that because the October 14, 1999 order had not been complied with, and had never been modified by the Court, it should be enforced. The College also asserted that the Board had no intention of adopting a bond ordinance. The judge agreed that his prior order had not been formally amended and, notwithstanding the time line established by the State Treasurer, ordered the Board to appropriate the funds within ninety days. He said that failure to comply could result in individual sanctions against any noncomplying Freeholders. An April 12, 2001 order gave the Board until June 28, 2001 to adopt some plan for funding the College's project.

The Board moved for reconsideration of this order on May 4, 2001, asserting that either the statute compelling appropriation is unconstitutional[7] or the College was equitably estopped from requiring appropriation within the period specified in the April 12, 2001 order. The Board again noted the question of the college

---

[7] The attorney for the Board stated at this proceeding that pursuant to *R.* 4:28–4, the deputy attorney general in charge of litigation was served with notice that the Board was challenging the constitutionality of the statute, either as written or as applied to Warren County. The Attorney General was thus given the opportunity to participate but apparently declined to do so.

status of the institution. The judge denied the motion and the Board appealed from the May 25, 2001 order.

When the June 28, 2001 deadline arrived without action by the Board, which had in fact rejected a bond ordinance on June 27, 2001 by a vote of two to one, the College filed a "verified complaint," captioned "In the Matter of Warren County Board of Chosen Freeholders Charged With Contempt of Court" and listing "the undersigned attorneys" for the College as the complainants. It was supported by a verification of the College's attorney attaching various orders and exhibits. The Board was charged with contempt (under *R.* 1:10–2(a)) of the various court orders compelling appropriation. On July 2, 2001, the judge who had issued the prior orders held a proceeding at which the two Freeholders who voted against the bond ordinance, Michael Doherty and John DiMaio, explained their reasons for not complying, in part as discretionary acts and on the belief that the College had not properly received county college status pursuant to law. The judge found both Freeholders individually in contempt of the prior orders and imposed sanctions in the form of paying the College's attorney's fees. The individual Freeholders were never named parties to the action. As part of the defense the Freeholders had argued on May 25 and July 2, as well as on August 16, 2001, that the Board should not "be held in contempt because they acted upon their reasonable belief that the college was not properly established pursuant to State law." Essentially, the Freeholders were maintaining that they had responsibility for and control of the budget for the county and the community college.

An August 14, 2001 order imposed sanctions and stated that if the appropriations were not made by August 27, 2001, the individual Freeholders were to be incarcerated. A motion for reconsideration was denied after the hearing on August 16, 2001. The Board then filed a separate notice of appeal of the contempt order. Although a different panel of this court had denied a stay pending appeal, the Supreme Court stayed the contempt order pending the appeal.

## I.

Initially, we address the College's argument in docket number A–5697–00 that the County's appeal is untimely because it did not appeal the October 14, 1999 order. We reject the argument that the appeal should be dismissed.

The College relies on *IMO Newark Teachers Union, Local 481 American Federation of Teachers AFL–CIO*, 118 *N.J.Super.* 215, 221, 287 *A.*2d 183 (App.Div.1972), for the proposition that a party may not simply ignore an order and then appeal from that order. Of course, in the usual case that is axiomatic. The *Newark Teachers Union* case is factually distinguishable, however. In that case, there was a court order prohibiting public employees, the teachers of Newark, from an illegal act, a strike or job action. Rather than appeal the order, the teachers went on strike in outright defiance of the order. Sanctions were then imposed for violating the law and the order. But these sanctions were not imposed on public officials for failure to do a discretionary act. Rather, they were imposed on individuals who were teachers who had openly defied a court order to return to school to teach.

The present case does not present such a situation and is complicated by the fact that public policy and appropriations are implicated. The October 14, 1999 order required the County "to appropriate pursuant to *N.J.S.A.* 18A:64A–19(2)," the capital outlay funds by November 13, 1999.[8] After informally extending this deadline with the College, the Board took the first step towards issuing bonds by sending a letter of intent to the State Treasurer.

---

[8] We do not read this order as requiring the entire bonding process to be complete within thirty days. There is more involved than the Board simply deciding that it wants to issue bonds. Furthermore, the County did not receive authorization from the State Treasurer until May 2, 2000, more than four months after the transmittal of the letter of intent. If the request had been denied, the County would have had to carry all of the bonding costs or seek to raise the funds by an increase in the County portion of local property tax bills in municipalities by request to the County Tax Board for the necessary amounts.

The approval gave the Freeholders until August 30, 2002 to issue the bonds. The Board apparently decided to exercise its discretion and wait until that date to take action.

■ The College decided the County was not acting expeditiously and sought to enforce its rights as a litigant. The April 12, 2001 order, and the denial of reconsideration on May 25, 2000 imposed new and different obligations on the County, specifically, to complete the appropriations process by June 28, 2001. This order was contrary to the deadline established by the State Treasurer and removed the inherent discretion from the Freeholders. It is the April 12, 2001 and May 25, 2001 orders that the County appeals and thus the notice of appeal was timely filed.

## II.

■ We now address the Board's argument that *N.J.S.A.* 18A:64A–19(2) is unconstitutional only as applied to Warren County. The Legislature has created a mechanism whereby a community college board of trustees [9] may seek funding for certain improvements, including construction, acquisition, expansion, or capital renewal and replacement. The normal procedure is for a college board of trustees to adopt a resolution requesting funding from the county. *N.J.S.A.* 18A:64A–19(1). This resolution is forwarded to the college's board of school estimate. *Ibid.* As

---

[9] The College objected that the County's position that the College was not established properly as a county college under the statutes was not timely raised. While issues generally not raised below need not be considered, this issue was raised by the Board on at least three occasions in the trial court. Apparently, there had also been some concerns previously expressed by certain people who questioned the change in status. However, the obvious public interest questions on this appeal dictate that we consider the issue to the extent relevant. The Board has not challenged the *de facto* existence of the College, rather it asserts its failure to be established pursuant to the statutes as a college is a defense in their resistance to the order to appropriate funds and the contempt order. Compare *N.J.S.A.* 18A:64A–2 (procedure for county colleges) with *N.J.S.A.* 18A:64A–30 (procedure where a board of chosen freeholders does not wish to establish county college, but rather a county college agency).

noted, this is an unelected board created by statute consisting of two college [10] trustees and three freeholders. *N.J.S.A.* 18A:64A–15. Its function is to determine if the funding sought by a college should be approved. *N.J.S.A.* 18A:64A–19(1). Thus, two-fifths of this body consists of individuals who have not been elected by the people of the county. If the board of school estimate approves the trustees' request, the members sign a certificate and transmit it to the county board of freeholders. *N.J.S.A.* 18A:64A–19(1).

Upon receipt of the certification, *N.J.S.A.* 18A:64A–19(2) states that the board of freeholders "shall" appropriate the necessary funds to complete the project by one of two methods. The first is by an appropriation which involves a procedure for property tax increases. *N.J.S.A.* 18A:64A–18 or *N.J.S.A.* 18A:64A–19(1). The other is by issuing bonds. *N.J.S.A.* 18A:64A–19(2)(b).

In this case, the Trustees adopted its first resolution calling on the County to raise funds for its building project by seeking Chapter 12 matching funds. The board of school estimate adopted this request and specifically mentioned Chapter 12 in the certificate first forwarded to the Board. Thus, the Trustees and board of school estimate envisioned a bond issue to fund the project.

The Board argues that *N.J.S.A.* 18A:64A–19(2) is an unconstitutional delegation of the sovereign power to tax to an unelected body contrary to longstanding principles. It relies on *Township of Bernards v. Allen,* 61 *N.J.L.* 228, 39 *A.* 716 (E. & A. 1897), which dealt with the power of commissioners appointed by the governor to raise taxes in excess of a value decided at a town meeting. *Id.* at 231, 39 *A.* 716. The commissioners based their tax levy on a statute requiring assessments for the protection of public health. *Id.* at 232, 39 *A.* 716. Our former Court of Errors and Appeals (the then highest court in this State) struck down the tax in excess of the amount agreed to by the town. *Id.* at 242–243, 39 *A.* 716. In reaching this result, the Court examined the history

---

[10] Our discussion here is in general and assumes legal status as a college.

of the power to tax dating back to the Norman kings of England up to the time New Jersey became a colony and then as the State of New Jersey. *Id.* at 232–237, 39 *A.* 716. The Court noted that the Legislature is vested with the sovereign power to tax, in the name of the people. *Id.* at 236, 39 *A.* 716. It may delegate this power to certain local boards, provided these bodies are elected. *Ibid.* The power to tax may not be conferred to, "ministerial officers or to another department of the government." *Id.* at 238, 39 *A.* 716. *See also Van Cleve v. Passaic Valley Sewerage Com'rs,* 71 *N.J.L.* 574, 60 *A.* 214 (E. & A.1904).

The board of school estimate for a county college is not an elected body. It is, however, at all times theoretically controlled by a majority who are the three elected freeholders. Just as the board of trustees of the college appoints two of its members, the board of freeholders in each county has three of its members, the chairman of the board of freeholders, and two others, to sit on the board of school estimate. Thus, in the usual case, just as the college trustees, it would be expected that a board of freeholders would select members who agree with the views of the majority of the freeholders on county college funding and any capital expenditures. If a majority of a board of freeholders does not feel that there should be such an assessment, it can in the usual situation where there are more than three freeholders, appoint three likeminded individual freeholders to the board of school estimate and reject the proposal. Thus, in the usual case, no certification will issue by the board of school estimate without tacit approval by the majority of the freeholders. The statutory system for appropriating funding for county colleges contemplates the involvement of public officials in the appropriations process (which is a political process), leaving the ultimate decision on raising funds to the approval of elected officials.

■ When applied to Warren County, though, *N.J.S.A.* 18A:64A–19(2) produces an unconstitutional result. Boards of Chosen Freeholders may consist of three, five, seven, or nine people. *N.J.S.A.* 40:20–20. Warren County is unique among the

twenty-one counties of New Jersey in that its Board of Freeholders consists of only three persons.[11] As a result, all three of Warren County's Freeholders sit on any board of school estimate. Unlike other counties, the majority of the Freeholders are unable to choose members who will all express the wishes of the majority, as the Trustees were able to do with its membership despite its divided votes for the project among the trustees. In counties with a greater number of freeholders the majority can preclude issuance of certificates by the board of school estimate that the Board is not willing to adopt. In the instant case, the view of one Freeholder, who differed with the other two, was enough to permit approval of the certificate for the College's building project at the board of school estimate level. The issue then becomes whether under a literal reading of *N.J.S.A.* 18A:64A–19(2), the Board is supposed to appropriate upon receipt of the certificate. If so, in Warren County, a minority of the Board can bind the majority by voting with two of the College trustees to approve the building project.

 The power to raise taxes or issue bonds cannot be delegated by the Legislature to unelected bodies. *Bernards Township, supra* (61 *N.J.L.* at 238, 39 *A.* 716). *See also,* relying on *Bernards Township, Meadowlands Reg. Dev. Agency v. State,* 112 *N.J.Super.* 89, 270 *A.*2d 418 (Ch.Div.1970), *aff'd,* 63 *N.J.* 35, 304 *A.*2d 545 (1973) (only ministerial acts can by delegated). Despite this longstanding constitutional principle, this is in effect what has happened in Warren County, where the board of school estimate,

---

[11] Prior to 1981, the size of county boards of freeholders was based on the population of the county. Counties with less than 125,000 people had a board of three members. *L.* 1969, *c.* 248, § 1 (codified at *N.J.S.A.* 40:20–20). The act was amended in 1981 to permit a county to choose the size of its board, up to nine members. *L.* 1981, *c.* 462, § 34. Warren County had a population less than 125,000 in 1981 and thus would have had a board of three. The size of the county's board was to stay as it was, unless the people voted to increase or decrease the size of the board. Presumably, the people of the county never voted to change the size of the board, as other counties with lower populations, such as Hunterdon County, did.

an unelected body, although containing three elected officials, has been permitted, by the motion judge's ruling, to compel Freeholders as county legislators to vote for an appropriation, even though a majority of the elected Freeholders are opposed to the plan and deem it contrary to the interests of their constituents, the taxpayers and voters. The record indicates that a majority of the voters in Warren County who voted on the issue opposed the plan in the non-binding referendum.[12]

Under New Jersey precedent, bonding is a discretionary decision. In *Union County Park Commission v. Board of Chosen Freeholders of Union County,* 3 *N.J.* 73, 74–75, 68 *A.*2d 870 (1949), a statute required the county to issue bonds upon requisition by the parks commission, without a referendum by the voters. Despite the use of the word "shall," the elected body still had the power, under the local bonding law, to issue or not issue bonds. Thus, the county could exercise its discretion. *Id.* at 77, 68 *A.*2d 870. The Court held that the Legislature intended the electorate, either through a direct referendum on bonding, which was not permitted here, or through the elected board of freeholders, to have the final say on the issuance of bonds. *Id.* at 78, 68 *A.*2d 870.

The motion judge's order completely takes any inherent discretion away from the board and places the judiciary in the position of intruding on the legislative authority of the Board. The principle of separation of powers is firmly entrenched in our

---

[12] In a non-binding referendum held on November 3, 1998, approximately two weeks before the Trustees voted to pursue its building plan, the people of Warren County voted, 14,976 to 8,894 against the capital project the Trustees had then proposed at a cost of $5,600,903, approved. The ballot question specifically asked if the voter approved of bonding to pay for the project. The judge and the College were of the view that the point of *N.J.S.A.* 18A:64A–19(2) is to take certain matters out of the political process. However, the same argument was made in *Bernards Township.* The Court noted, "The [lower] court allowed the levy of the commissioners for the protection of public health to stand, on the ground that it was the duty of the voters of the township, at the town meeting, to provide for raising funds for these purposes." *Bernards Township, supra* (61 *N.J.L.* at 232, 39 *A.* 716). Despite the obligation to appropriate such funds, the State could still not delegate the sovereign power to tax to unelected officials.

concept of governance. Indeed, Article III of our State Constitution states:

> The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.

We do not believe that this principle is restricted to state government and the wording of the constitutional provision does not so indicate.

In *Camden County Board of Chosen Freeholders v. Camden County Clerk*, 193 *N.J.Super.* 100, 472 *A.*2d 178 (Law Div.), *aff'd*, 193 *N.J.Super.* 111, 472 *A.*2d 184 (App.Div.1983), the question of delegating power to a county in violation of *N.J. Const.* art. III (separation of powers) was addressed. There, the Chief Justice issued budget procedures for the county Assignment Judges and Trial Court Administrators, pursuant to his authority under *N.J. Const.* art. VI, § 2, ¶ 3 and *N.J. Const.* art. VI, § 7, ¶ 1. The County sought to place a non-binding referendum on the ballot, challenging the directive as infringing on the County's budgeting procedures. One reason for dismissing the County's request was the directives were issued pursuant to the Chief Justice's constitutional authority. The County, which can only have those powers delegated by the Legislature, cannot interfere with the judiciary's ability to administer its own affairs. Thus, the County did not have the ability to control the judiciary's budget. Referendum questions must only concern matters upon which the County could act, and thus the referendum question was held invalid. This is not a case where a public official is violating constitutional duties or where ministerial acts are involved. What is at issue is the function of county government and responsibility of the Freeholders. Absent explicit authorization in the Constitution, and aside from principles of legislative immunity, neither a freeholder nor a state legislator can be compelled to cast a vote in a court-ordered manner on any issue. If this could be done here, even by indirect sanction, we see no end to the potential mischief at every level of government. The function of a court does not

include intruding on a legislative process. Indeed, if the project could be forced on Warren County's taxpayers it could be asked if there is any limit to what the College could seek by way of construction projects. This is apart from the issue of whether the College is properly constituted as a county college, rather than being a county community agency governed by a commission.

Simply put, the judge here essentially told the County to raise money by taxation or bonding. Both are discretionary legislative functions, and the Board cannot be compelled, as a result of a certificate of an unelected body, or direct court order, to appropriate the funds. The majority of the elected freeholder board can refuse to spend public money for a project they oppose.

The College argues that the board of school estimate has the power to compel appropriations even if it requires a legislative body to vote contrary to the majority's view. In support of its contention, the College relies on *Board of Education, City of Garfield v. City of Garfield,* 147 *N.J.Super.* 146, 370 *A.*2d 890 (App.Div.1977). There, the board of school estimate told the city to appropriate $65,000 for a school lunch program and the city refused. The court found that the appropriation was required because Garfield had a type I school district which gave the board of school estimate the power to order appropriations. *Id.* at 148, 370 *A.*2d 890. The crucial point of our holding was that the citizens of Garfield voted to adopt a type I school district, and were charged with knowledge that the form of school system they were adopting had authority to order funding.

█ The Warren County Community College Agency and its Commission were created solely by a vote of the Freeholders under *N.J.S.A.* 18A:64A-30 *et seq.* apparently because they did not want to establish a community college. The Freeholders never subsequently sought to convert its status to a county college (and give it eminent domain power) or establish it as a county college under *N.J.S.A.* 18A:64A-2. Nor did the voters of Warren County or the Board vote to establish a county college. The validity of the establishment as a county college (rather than a State college)

by fiat of the State Board of Higher Education [13] was contested by the County. The board of school estimate exists under a state statute (*see N.J.S.A.* 18A:64A–15) and functions in the required appropriation context only with respect to county colleges. Its non-freeholder members are not elected by the county's voters. The language of *N.J.S.A.* 18A:64A–15 only refers to county colleges and does not appear by its terms to apply to a county "community college agency."

The College argues that Warren County cannot now deny the College's existence as a county college because it has worked with it and raised funds for it in the past. Of course, it also did so as a county "community college agency" which the Board created under the applicable statutes. However, even though the Board funded the College in the past, this does not alter the fact that the voters of the county, neither directly nor by vote of the Board, *see N.J.S.A.* 18A:64A–30, either chose county college status for the College or voted to allow a board of school estimate to tax them or mandate debt through bonds. Thus, the reasoning of *Garfield* does not support the College's position.

The normal route to establish a county college is for the board of freeholders of an interested county or counties to "petition the commission on higher education for permission to establish and operate a county college." *N.J.S.A.* 18A:64A–2. This contrasts with the situation where the Board does not choose the county college route and goes the community college agency route under *N.J.S.A.* 18A:64A–30 *et seq.* There are several significant differences in the law applicable to a county college as contrasted with a

---

[13] It is difficult to reconcile under the statutes how the State Board of Higher Education took upon itself authority to create a county entity and usurp the power of the Board. The State Board's action in its resolution of January 24, 1992 was sought to be justified after the fact by a June 28, 1993 opinion letter, from a deputy attorney general then assigned to represent the State Board, which opined that County approval or a referendum was unnecessary. The County asserts, though, that the statutory procedures are a necessary part of the creation of a county college due to the financial commitments of such an institution.

county "community college agency." In addition to lack of condemnation powers a county "community college agency" can only submit a recommendation to the Board for "the funds necessary to be included in the county budget." [14] *N.J.S.A.* 18A:64A–36.

The College also cites *Barber v. Board of School Estimate of the Elizabeth School Dist.*, 71 *N.J.Super.* 556, 568, 177 *A.*2d 600 (Law Div.1962), for the proposition that statutes must not be read to reach an "anomalous or absurd" result. However, the result urged by the College is somewhat anomalous. Throughout the State, only one board of school estimate has the power to coerce a legislative body and its majority of elected officials to act against their will. This affront to our constitutional system renders *N.J.S.A.* 18A:64A–19(2) invalid as applied in Warren County.

### III.

▇ Our attention now turns to the contempt orders in the appeal in A–105–01. Procedural deficiencies in the contempt proceedings initiated by the College pursuant to *R.* 1:10–2(a) require that the orders of contempt issued against Freeholders Michael Doherty and John DiMaio be reversed. *See, e.g., Amoresano v. Laufgas*, 171 *N.J.* 532, 796 *A.*2d 165 (2002).

---

[14] *N.J.S.A.* 18A:64A–35 establishes the powers of the board of trustees with respect to a community college agency. This section refers to *N.J.S.A.* 18A:64A–12, which enumerates the powers of a county college board of trustees. This section does not mention the board of school estimate. *N.J.S.A.* 18A:64A–35 excludes the power of eminent domain from a community college agency.

*N.J.S.A.* 18A:64A–36 discusses the procedures for requesting funds by a community college agency. This statute instructs the agency to "recommend the funds necessary to be included in the county budget pursuant to *N.J.S.* 18A:64A–15 through 20 for the purpose of public higher education in accordance with the needs for support and facilities as determined by the commission." The cited sections of the statute include the general procedures in *N.J.S.A.* 18A:64A–19(2), the section being challenged by the Warren County Board of Chosen Freeholders. However, *N.J.S.A.* 18A:64A–36 clearly restricts a commission's authority to making recommendations, as opposed to issuing bonding certificates, as the board of school estimate claims it may.

██ Every contempt proceeding must comport with the procedures outlined in *R.* 1:10–2, even if the order is issued under the court's inherent contempt of court powers. *Amoresano v. Laufgas, supra* (171 *N.J.* at 556–557, 796 *A.2d* 180); *Matter of Duane, Morris & Heckscher,* 315 *N.J.Super.* 304, 312, 718 *A.2d* 244 (App.Div.1998). Also, *R.* 1:10–2(a) provides:

> Institution of Proceedings. Every summary proceeding to punish for contempt other than proceedings under *R.* 1:10–1 shall be on notice and instituted only by the court upon an order for arrest or an order to show cause specifying the acts or omissions alleged to have been contumacious. The proceedings shall be captioned "In the Matter of _____ Charged with Contempt of Court."

The complaint filed by the College clearly did not indicate that Freeholders as individuals were personally the subjects of the contempt proceedings. The caption was: "In the Matter of Warren County Board of Chosen Freeholders Charged with Contempt of Court." The verified complaint did not name the individual Freeholders; and it should not have if legislative immunity applies.[15] In short, the individual Freeholders were not on notice that they could be subject to contempt proceedings and sanctions.

The College argues that the two Freeholders on the then constituted Board were on notice of the contempt allegation and that they appeared and made statements at the contempt proceeding. This argument ignores the requirements of *R.* 1:10–2(a), that clearly requires the names of the parties charged with contempt to be named in the caption and the complaint. Of course, the individual Freeholders would be expected to know of the contempt proceedings as members of the Board charged with contempt. This does not translate to being on notice of potential personal sanctions, as contrasted with coercion. *See Catena v. Seidl,* 68 *N.J.* 224, 229, 343 *A.2d* 744 (1975) (coercive order cannot be used to punish). Indeed, the motion judge took it upon himself to impose these sanctions, when not sought in the College's verified complaint.

---

[15] See note 17, *infra.*

*R.* 1:10–2(c) also calls for the prosecution of a contempt proceeding by a party other than one connected with the case.

Prosecution and Trial. A proceeding under *R.* 1:10–2 may be prosecuted on behalf of the court only by the Attorney General, the County Prosecutor of the county, or where the court for good cause designates an attorney, then by the attorney so designated.

In the instant matter, counsel for the College signed and verified the complaint on behalf of "the undersigned attorneys" and prosecuted the contempt proceedings. In *East Brunswick Board of Education v. East Brunswick,* 113 *N.J.Super.* 268, 271, 273 *A.*2d 600 (App.Div.1971), we recommended that the Attorney General or county prosecutor prosecute contempt proceedings. The amendment to the rule in 1994 reflects this recommendation. Pressler, *Current N.J. Court Rules,* comment 3 on *R.* 1:10 (2002).

The judge here never made findings of good cause for not having the Attorney General, if not the county prosecutor, handle the contempt proceedings. The College's brief alleges that the judge orally decided that due to the political nature of the case, there was good cause to not have local law enforcement involved. However, this assertion is not supported by the record of the July 2, 2001 contempt proceedings. In any event, if this case is as politically charged as alluded to in the record, judicial involvement should be circumspect and it is even clearer that the attorney for the College should not have prosecuted the contempt.

Moreover, under prior versions of *R.* 1:10–2, the judge whose order was allegedly contemned could not hear the contempt proceeding, although the parties could consent to the same judge hearing the matter. Pressler, *Current N.J. Court Rules,* comment 3 on *R.* 1:10 (2002). It was reversible error for the same judge to hear the proceedings. *City of Bridgeton v. Jones,* 228 *N.J.Super.* 325, 337–338, 549 *A.*2d 877 (App.Div.1988). *R.* 1:10–2(c) was amended in 1994 to read in pertinent part, "The matter shall not be heard by the judge who instituted the prosecution if the appearance of objectivity requires trial by another judge."

In this case, the same judge who issued the order should not have heard the contempt proceeding. Questions were raised

about his objectivity as well as the validity of the orders. Prior to the July 2, 2001 proceeding, the judge commented that if the Freeholders did not appropriate the funds the Board would be in contempt. He even indicated that he would be willing to hold individual Freeholders in contempt if his order was not followed. In making these statements, the judge took noncompliance with his orders as a personal affront, and became an advocate for the propriety of his own orders.[16]

Prior to hearing from the Freeholders or the County's counsel on July 2, 2001, the judge made statements, such as: "I'm curious as to how they are above the law. Perhaps that might be addressed." "Well—they're certainly entitled to their right of free speech, but I would assume that what they have to say here today has to do with why they're not in contempt of court because they are in contempt of court and I don't know-philosophical differences." Furthermore, before stating that the Warren County taxpayers should not have to bear the costs of the Freeholders' actions, the judge referred to himself on several occasions as a Warren County taxpayer. "I didn't say you had to do one or the other. I would hope as a taxpayer of Warren County that you—that half the expense of this—this addition ought to be paid by the State of New Jersey." "Six grand a year, I'm not terribly happy with it either." The judge did state that he felt his order was properly entered, but he felt disrespected as a judge and his "orders are being disrespected." He concluded he was obliged to "carry them out." Under all the circumstances the contempt proceedings should have been held before another judge.

*R.* 1:10–2(c) also provides that if a party is found to be in contempt, the following provisions of *R.* 1:10–1 apply: "Execution

---

[16] Whether the College was authorized pursuant to statutory procedures or not may have a bearing on the funding requirement, but is irrelevant to an issue of contempt. Prompt appeal is what is required. A good motive does not excuse a willful violation of an unreversed court order. *In re William Brown Jr.*, 50 *N.J.* 435, 437, 236 A.2d 142 (1967); *In re Contempt of Carton*, 48 *N J.* 9, 25, 222 A.2d 92 (1966). By virtue of our decision today that order is now not binding.

of sentence shall be stayed for five days following imposition and, if an appeal is taken, during the pendency of the appeal, provided, however, that the judge may require bail if reasonably necessary to assure the contemnor's appearance."

Moreover, in this case the trial judge denied a stay despite the requirements of the Rules of Court. Finally, the Supreme Court granted a stay on September 7, 2001. The Board maintains that the judge's failure to follow the proper procedures only highlighted his lack of objectivity here and resulted in a denial of due process. Cumulatively, all of the circumstances indicate serious defects in the proceedings.

Finally, the judge also erred in awarding attorneys' fees to the College for prosecuting the contempt proceedings that were assessed against the two individual Freeholders personally. No fee allowance may be made to a private attorney for prosecuting a contempt proceeding. The purpose of contempt proceedings is to vindicate the authority of the court. *East Brunswick, supra* (113 *N.J.Super.* at 271, 273 *A.*2d 600). Only reasonable out-of-pocket expenses incurred by a private prosecuting attorney would be reimbursable. *In re Morse*, 157 *N.J.Super.* 104, 106–107, 384 *A.*2d 562 (App.Div.1978). Even if the contempt adjudication was upheld, and we do not do so in this case, the award of counsel fees was improper.

IV.

In addition to the above-noted procedural deficiencies in contempt proceedings, imposing such sanctions on the individual Freeholders lacks substantive merit and violates traditional equitable principles. *Spallone v. United States*, 493 *U.S.* 265, 274, 110 *S.Ct.* 625, 631, 107 *L.Ed.*2d 644, 654 (1990). While no New Jersey case has directly addressed the issue, the United States Supreme Court has held in connection with a federal discrimination suit involving a consent order that before orders of contempt may be issued against individual elected officials an order of contempt must first be issued against the local governing body. *Id.* at 280,

110 *S.Ct.* at 634, 107 *L.Ed.*2d at 658. Some of the principles articulated in *Spallone* are applicable here.

*Spallone* dealt with reversal of four orders of contempt issued against the majority members of the Yonkers City Council for failing to comply with a federal court order, including a consent order, regarding discrimination and requirements to end desegregation in the city's public housing plan. *Id.* at 272, 110 *S.Ct.* at 630, 107 *L.Ed.*2d at 653. When the council failed to adopt the necessary ordinances, the district court held the four members voting against adoption of an ordinance personally in contempt of court and ordered them to pay fines. *Ibid.* The United States Supreme Court reversed the orders.[17] *Id.* at 280, 110 *S.Ct.* at 634, 107 *L.Ed.*2d at 658. As an alternative the Court discussed the effect of the city as an entity being held in contempt and fined. The individual legislators would then have to decide how to proceed in the best interests of the city. *Id.* at 279, 110 *S.Ct.* at 634, 107 *L.Ed.*2d at 658. The *Spallone* majority observed:

Sanctions directed against the city for failure to take actions such as those required by the consent decree coerce the city legislators and, of course, restrict the freedom of those legislators to act in accordance with their current view of the city's best interests. But we believe there are significant differences between the two types of fines. The imposition of sanctions on individual legislators is designed to cause them to vote, not with a view to the interest of their constituents or of the city, but with a view solely to their own personal interests. Even though an individual legislator took the extreme position—or felt that his constituents took the extreme position—that even a huge fine against the city was preferable to enacting the Affordable Housing Ordinance, monetary sanctions against him individually would motivate him to vote to enact the ordinance simply because he did not want to be out of pocket financially. Such fines thus encourage legislators, in effect, to declare that they favor an ordinance not in order to avoid bankrupting the city for which they legislate, but in order to avoid bankrupting themselves.

This sort of individual sanction effects a much greater perversion of the normal legislative process than does the imposition of sanctions on the city for the failure of these same legislators to enact an ordinance. In that case, the legislator is only

---

17 Because the contempt order was reversed the court did not address defenses of First Amendment violations and absolute immunity for legislators. 493 *U.S.* at 274, 110 *S.Ct.* at 631, 107 *L.Ed.*2d at 654. We note that in this case the individuals were considered by the dissent as "acting outside of their 'sphere of legitimate legislative activity.' " *Id.* at 305, 110 *S.Ct.* at 647, 107 *L.Ed.*2d at 674.

encouraged to vote in favor of an ordinance that he would not otherwise favor by reason of the adverse sanctions imposed on the city. A councilman who felt that his constituents would rather have the city enact the Affordable Housing Ordinance than pay a "bankrupting fine" would be motivated to vote in favor of such an ordinance because the sanctions were a threat to the fiscal solvency of the city for whose welfare he was in part responsible. This is the sort of calculus in which legislators engage regularly.

> We hold that the District Court, in view of the "extraordinary" nature of the imposition of sanctions against the individual councilmembers, should have proceeded with such contempt sanctions first against the city alone in order to secure compliance with the remedial order. Only if that approach failed to produce compliance within a reasonable time should the question of imposing contempt sanctions against petitioners even have been considered. "This limitation accords with the doctrine that a court must exercise '[t]he least possible power adequate to the end proposed.'" [Citations omitted.]

> [*Id.* at 279–280, 110 *S.Ct.* at 634, 107 *L.Ed.*2d at 658 (*quoting Shillitani v. United States*, 384 *U.S.* 364, 371, 86 *S.Ct.* 1531, 16 *L.Ed.*2d 622 (1966)).]

The case at bar presents circumstances far less egregious and clear than in *Spallone*, which involved serious federal constitutional issues. Two Freeholders were personally held in contempt and sanctioned when they had never been so charged or liable. The judge stated that he did not believe that the taxpayers of Warren County should have to pay for their Freeholders' defiance (although the actions of the majority of Freeholders was in accord with a non-binding referendum of the county's voters who elected to be counted). Thus, the individual Freeholders were improperly sanctioned here. In view of our decision we need not further address any issue of legislative immunity.

Based on the foregoing, the order under appeal in docket number A–5697–00 is accordingly reversed. We also vacate the contempt order and sanctions in docket number A–105–01.