# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1969-20

A.J.S.,[1]

    Plaintiff-Respondent,

v.

J.Y.E.,

    Defendant-Appellant.

_____

Submitted November 8, 2021 – Decided December 3, 2021

Before Judges Vernoia and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-1654-21.

Destribats Campbell Staub & Schroth, LLC, attorneys for appellant (Raymond C. Staub, on the brief).

Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials to protect the identity of the victim. R. 1:38-3(c)(12).

Defendant J.Y.E. appeals from a March 12, 2021 final restraining order (FRO) entered against him under the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to -35. Judge Daniel H. Brown conducted the FRO hearing, entered the FRO, and rendered an oral opinion. We affirm.

I.

The following facts are derived from the record. Defendant and his former girlfriend, plaintiff A.J.S., had a seven-month dating relationship, which plaintiff ended on February 5, 2021. The domestic violence complaint alleges that on February 13, 2021, defendant dropped off a bouquet of flowers at plaintiff's residence unannounced. She learned defendant hired a private investigator to follow her and confronted him about it on February 20, 2021. During their encounter, plaintiff claims defendant admitted he hired a private investigator on February 15, 2021,[2] to surveil plaintiff and that he "paid him $5,000." At the FRO hearing, plaintiff and defendant were both self-represented and testified with the aid of a Haitian/Creole interpreter.

---

[2] Plaintiff originally testified defendant first informed her of the private investigator on February 13, 2021. She later testified he informed her on February 15, 2021. When the judge attempted to clarify the correct date, plaintiff testified it was February 15, 2021.

A-1969-20

Plaintiff testified about defendant's controlling and abusive behavior throughout their relationship. By way of example, plaintiff explained defendant demanded she answer the phone when he called; he showed up at her home unannounced and over her objection on multiple occasions; and he approached her unexpectedly while they were on the phone communicating with each other. In addition, plaintiff testified defendant accused her of seeing another man; would verify her whereabouts; and he timed her activities while waiting for her to come home. Plaintiff observed defendant driving around her apartment complex after their break-up.

Plaintiff also asserted that defendant's behavior became "erratic," which alarmed her. Furthermore, according to plaintiff, defendant threatened to commit suicide because plaintiff refused to open her car door and speak with him. When plaintiff asked defendant why he threatened to kill himself, he responded "to get a reaction out of [her]." Plaintiff testified defendant confessed to hiring a private investigator to report on everything she was doing after plaintiff told defendant not to come over to her apartment because she was sick.

When plaintiff questioned defendant about why he hired the private investigator, his response, according to plaintiff, was, "I was mad at you, I didn't believe you, and [the investigator] made me feel good. [The investigator] told

me when you put the dog down, when you went to Panera Bread." Plaintiff testified that on February 20, 2020, defendant "asked [her] to look for his glasses because he lost them" when he walked up to her car that Friday night and "opened it without [her] inviting him over," which he "had done several times."

Plaintiff also stated that on at least three prior occasions before their relationship ended, defendant put his hands around her neck until she told him to stop and "elbowed" her in the arm. Defendant also acted irrationally when he became angry, including beating a desk. On one occasion, plaintiff went to her daughter's house and defendant told her that when she arrived, she "must call him on [a] video call," provide the address, and call him "every single hour she was there." Plaintiff did not call the police with respect to any of these incidents. The record does not reflect that plaintiff moved any items into evidence.

Judge Brown then directed defendant to cross-examine plaintiff following her testimony, instructed him on how to conduct cross-examination, to face the judge, and ask the questions. After the judge asked him, "Do you have any questions?" Defendant responded "yes" and asked the judge if he could "open" his phone to "refresh his recollection," and the court allowed it. Defendant did not question plaintiff but proceeded to say:

> She claims that the day she came to my house, sir, I put
> my hands . . . around her neck. Now if she thought I

> was about to do something bad to her, why didn't she call the police, sir?
>
> To begin with, she's the one who called me to ask me if she came to my house.

The judge replied, "All right. So[,] the [c]ourt will assume that . . . defendant has no questions to ask the plaintiff?" Defendant did not object or answer the question. The judge then inquired whether plaintiff had any witnesses, but ultimately barred her one proposed witness based on his lack of personal knowledge relative to plaintiff's testimony.

After plaintiff rested, defendant testified. Regarding his alleged threats of suicide, defendant corroborated plaintiff's testimony by admitting he threatened to kill himself if she broke up with him on February 5, 2021. Defendant explained that he wanted to "test her [and] how much she love[d] [him], but it was a joke." He denied calling plaintiff ten times straight after plaintiff wanted to end their relationship.

Defendant also denied hiring a private investigator or suggesting to plaintiff that he did. Instead, defendant testified that he "was the one following [plaintiff] because [he] was in a relationship with her." Defendant also revealed that he "took time off from work to really understand what was going on to follow her. Because [he] love[d] her and [he] need[ed] to know what's going on

A-1969-20

because [he] felt that she wasn't telling [him] the truth." Defendant also testified he followed her for "[o]nly one day" for "three hours," and that "[he] trusted her."

When the judge questioned defendant if he ever put his hands around plaintiff's neck, he denied the accusations. Contrarily, defendant responded, "I never . . . done something like that. Never. If . . . we are kissing with each other, . . . I can rub my hand over her head or face because I love her." The judge then asked plaintiff if she planned to cross-examine defendant, but she declined. Defendant did not present any other witnesses.

Following the parties' testimony, the judge gave his oral decision. After determining the court had jurisdiction under the PDVA based on the parties' dating relationship, the judge found plaintiff's testimony more "credible" than defendant's testimony and that she "met her burden by a preponderance of the evidence." The judge elaborated,

> The [c]ourt has to weigh the credibility of the parties. The [c]ourt considers things like the reasonableness of the testimony, the inherent believability of the testimony, and a witness's candor or evasion, amongst other things.
>
> The [c]ourt's had the opportunity to observe the parties and hear from them. The [c]ourt finds the . . . plaintiff to be more credible than the . . . defendant. The [c]ourt does not say this to be critical of the . . . defendant.

6

> There is something wrong, very wrong. His demeanor, it screams of being possessive and not understanding that it goes beyond somebody being upset with a relationship . . . .

Further, the judge found defendant's threats to kill himself were "[c]learly done in a manner to annoy and alarm" plaintiff, and his monitoring plaintiff for at least a week constituted alarming conduct. The judge detailed that defendant's "body language just exudes that he is hurt and troubled by . . . plaintiff and it is possessive[,] controlling[,] alarming[,] and scary, for lack of a better way of putting it." As to the prior history of domestic violence between the parties, the judge found plaintiff was "far more credible" about defendant putting his hands around her neck "on at least three occasions," and found defendant's testimony disingenuous that he was "massaging her head in a romantic way."

After crediting plaintiff's testimony about the private investigator, defendant's actions during the parties' relationship and his actions after the parties' relationship ended, the judge found defendant's conduct also constituted stalking because "[h]e knowingly engaged in this . . . conduct and it would certainly cause a reasonable person to fear for their safety." The judge concluded plaintiff established, by a preponderance of the credible evidence, the predicate acts of harassment, N.J.S.A. 2C:33-4(a) and (c), and stalking, N.J.S.A. 2C:12-10(b).

7

In light of defendant's course of conduct, the judge considered the existence of an immediate danger to plaintiff. Finding defendant did not understand "boundaries" in the context of a relationship that's "ending," and in order to "prevent further abuse," the judge determined the entry of an FRO was required.[3] This appeal followed.

On appeal, defendant challenges the credibility and factual findings of the judge, contending the evidence presented at trial did not support the conclusion that defendant committed the predicate acts of harassment and stalking as defined by statute. Defendant also contends the judge failed to engage in the proper analysis regarding plaintiff's need for protection under the second prong of Silver v. Silver, 387 N.J. Super. 112, 126 (App. Div. 2006), and interfered with his right to fully cross-examine plaintiff.

II.

Our limited scope of review of a trial court's findings of fact is well established. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). "[W]e grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div.

---

[3] At plaintiff's request, her two daughters were included as protected parties on the FRO.

A-1969-20

2013) (citing Cesare, 154 N.J. at 411-12). We will not disturb the court's factual findings and legal conclusions "unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (internal quotation marks omitted) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)).

Deference is particularly appropriate here, where the evidence is only testimonial and hinges upon a court's ability to make assessments of credibility. Amzler v. Amzler, 463 N.J. Super. 187, 197 (2020) (quoting Cesare, 154 N.J. at 412). It is axiomatic that the judge who observes the witnesses and hears the testimony has a perspective the reviewing court simply does not enjoy. See Pascale v. Pascale, 113 N.J. 20, 33 (1988). We also accord deference to the factual findings of Family Part judges because the court has "special jurisdiction and expertise in family matters." Cesare, 154 N.J. at 413. Conversely, a trial judge's decision on a purely legal issue is subject to de novo review on appeal. Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007) (citing Manalapan Realty, L.P., v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

The entry of an FRO requires the trial court to make certain findings, pursuant to a two-step analysis. See Silver, 387 N.J. Super. at 125; D.M.R. V.

9                                                                    A-1969-20

M.K.G., 467 N.J. Super. 308, 322 (App. Div. 2021) (quoting Silver at 125, 126-27).  Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred."  Silver, 387 N.J. Super. at 125. The trial court should make this determination "in light of the previous history of violence between the parties."  Ibid. (quoting Cesare, 154 N.J. at 402).

Secondly, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse."  Silver, 387 N.J. Super. at 127 (citing N.J.S.A. 2C:25-29(b) (stating "[i]n proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse"));  see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011).  Those factors include—but are not limited to—"[t]he previous history of domestic violence between the [parties], including threats, harassment and physical abuse[,]" N.J.S.A. 2C:25-29(a)(1), and "[t]he existence of immediate danger to person or property,"  N.J.S.A. 2C:25-29(a)(2).

The PDVA identifies predicate acts of domestic violence, which include harassment as defined by N.J.S.A. 2C:33-4 and N.J.S.A. 2C:25-19(a)(13). Pertinent to this appeal, N.J.S.A. 2C:33-4 provides:

[A] person commits a petty disorderly persons offense if, with purpose to harass another, he:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm; [or]
>
> . . . .
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

"When determining whether the harassment statute has been violated, 'courts must consider the totality of the circumstances.'" E.M.B. v. R.F.B., 419 N.J. Super. 177, 183 (App. Div. 2011) (quoting H.E.S. v. J.C.S., 175 N.J. 309, 326 (2003)).

"'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." D.M.R., 467 N.J. Super. at 323 (quoting H.E.S., 175 N.J. at 327). "Although a purpose to harass can be inferred from a history between the parties, that finding must be supported by some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487 (internal citation omitted) (citing State v. Hoffman, 149 N.J. 564,

11

577 (1997); State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989)). In other words, a plaintiff's subjective reaction to the conduct, standing alone, is insufficient to establish a defendant acted with improper purpose. Ibid.

Applying these legal principles and precedents to the circumstances of the present case, the judge concluded defendant violated N.J.S.A. 2C:33-4(a) by "threaten[ing] to kill himself on February 5 if [plaintiff] broke up with him" just to "get a reaction out of her." Moreover, the judge found defendant "corroborated" plaintiff's testimony and his statement "was clearly done with the purpose to harass her," as well as "annoy and alarm her" under subsection (a) of the harassment statute. The judge discredited defendant's testimony denying he had a private investigator follow plaintiff as not "reasonable or believable." The history cited by the judge, along with his specific findings, regarding defendant's course of conduct in February 2011, is fully supported by the record.

Stalking occurs when someone "purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his [or her] safety or the safety of a third person or suffer other emotional distress." N.J.S.A. 2C:12-10(b). The statutory prohibition is against conduct "that would cause such fear in an objectively reasonable person." State v. Gandhi, 201 N.J. 161, 187 (2010). A "course of conduct" is defined as,

"repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct or a combination thereof directed at or toward a person." N.J.S.A. 2C:12-10(a)(1).

There is adequate substantial evidence in the record to support the judge's finding that defendant stalked plaintiff. Defendant "knowingly engaged in this course of conduct" and "[i]t would defy logic to believe that he did this on one occasion." The judge was correct in his analysis.

When determining to grant an FRO pursuant to the PDVA, the judge must make two determinations. Silver, 387 N.J. Super. at 125-27. Under the first Silver prong, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. Under the second Silver prong, the judge must also determine whether a restraining order is necessary to protect the plaintiff from future acts or threats of violence. Id. at 127. The commission of one of the predicate acts of domestic violence set forth in N.J.S.A. 2C:25-19(a) does not, on its own, "automatically . . . warrant the issuance of a domestic violence [restraining] order." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995). Although that determination "is most

13

often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse."  Silver, 387 N.J. Super. at 127.

Physical abuse is not the only type of domestic violence contemplated by the PDVA; the Act is also designed to address emotional abuse.  See R.G. v. R.G., 449 N.J. Super. 208, 228 (App. Div. 2017) (finding an FRO is warranted where the defendant's conduct is "imbued by a desire to abuse or control the [plaintiff]" (emphasis added) (citing Silver, 387 N.J. Super. at 126-27)).  Here, the judge found the FRO was necessary to protect plaintiff by relying on her credible testimony that she was frightened by defendant's behavior in February 2021.

Under the second Silver prong, the judge must evaluate the six factors set forth in N.J.S.A. 2C:25-29(a) to determine whether granting a FRO is necessary "to protect the victim from an immediate danger or to prevent further abuse."  D.M.G., 467 N.J. Super. at 324 (quoting Silver, 387 N.J. Super. at 127).  The six factors are:

> (1) [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;

(2) [t]he existence of immediate danger to person or property;

(3) [t]he financial circumstances of the plaintiff and defendant;

(4) [t]he best interests of the victim and any child;

(5) [i]n determining custody and parenting time the protection of the victim's safety; and

(6) [t]he existence of a verifiable order of protection from another jurisdiction.

[N.J.S.A. 2C:25-29(a).]

After analyzing all six factors, Judge Brown concluded there was a need for an FRO under Silver. The judge explicitly found after "balancing these factors, notably [f]actors [one] and [two], the [c]ourt believe[s] that a[n] [FRO] is most definitely necessary to prevent further abuse." Only the first two factors were found applicable by the judge in the matter under review. The judge determined factor one weighed in favor of plaintiff's protection because he found "plaintiff to be far more credible with respect to [the] allegation" that "defendant put his hands around her neck on at least three occasions, both hands around her neck."

As to factor two, the judge highlighted the existence of immediate danger "goes beyond somebody having difficulty with a relationship that's ending" in

15

light of defendant's alarming, controlling, and possessive behavior. Moreover, the judge underscored that defendant does not understand plaintiff's "boundaries."

We conclude the judge's determination that an FRO was necessary to protect plaintiff was well-founded. As already noted, the judge found defendant's conduct was not simply an isolated incident. The second prong of Silver was properly analyzed and addressed by the judge. Therefore, we conclude there is no basis to disturb the judge's factual findings or legal conclusions. The judge heard testimony from the parties and had ample opportunity to assess credibility. There exists sufficient credible evidence in the record to support both Silver prongs, and we see no evidentiary errors, oversight, or abuse of discretion.

## III.

Addressing defendant's argument that the judge deprived him of the right to cross-examine plaintiff, we conclude his argument lacks merit. We recognize a trial is a search for truth, and cross-examination is the most effective device for it. See Peterson v. Peterson, 374 N.J. Super. 116, 124-25 (App. Div. 2005) (citations omitted). Therefore, trial judges must inform and uphold the parties' rights to a full hearing, including cross-examination. See J.D., 207 N.J. at 481;

16

See Franklin v. Stolkey, 385 N.J. Super. 534, 537, 543 (App. Div. 2006) (holding defendant was unaware of and denied her right to cross-examine plaintiff because the Family Part judge "conducted an informal and unorganized hearing"); See Peterson, 374 N.J. Super. at 124 (determining the judge's informal FRO hearing where only the judge asked direct questions interfered with the parties' right to cross-examination).

Based on our review of the record, Judge Brown properly afforded defendant his right to cross-examine plaintiff.  Here, the judge informed defendant, as a self-represented litigant, of his right to cross-examine plaintiff.  And, the judge asked him, "Sir, any questions for . . . plaintiff?"  Defendant chose not to ask plaintiff any questions.  Instead, he proceeded to defend the allegations in the complaint and to counter plaintiff's direct testimony.  After the judge determined defendant had no questions for plaintiff, the defense phase of the trial commenced.

The right of cross-examination is not unbounded.  The court may exercise reasonable control over witness questioning.  See N.J.R.E. 611.  As we have previously observed, "[w]e will not interfere with the trial judge's authority to control the scope of cross-examination 'unless clear error and prejudice are shown.'"  State v. Messino, 378 N.J. Super. 559, 583 (App. Div. 2005) (quoting

State v. Gaikwad, 349 N.J. Super. 62, 87 (App. Div. 2002)).  We conclude there was no irregularity in the judge's handling of plaintiff's testimony or defendant's right to cross-examine her, and no deprivation of his due process rights.

To the extent we have not addressed defendant's other arguments, it is because they are without merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1969-20